1   Andrew G. Ogden (CA Bar # 112384)
    3827 Silver Plume Circle
2   Boulder, CO 80305
    Tel: (303) 818-9422
3   aogden@indra.com

4   Sean T. Malone (OR Bar No. 084060) *Pro Hac Vice*
    259 E. 5th Ave., Ste. 200-C
5   Eugene, OR 97401
    Tel. (303) 859-0403
6   seanmalone8@hotmail.com

7   *Attorneys for Plaintiff*

8                 IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF CALIFORNIA
9                        SACRAMENTO DIVISION

10  CONSERVATION CONGRESS and          Case No.: 2:13-cv-00934-JAM-DB
    CITIZENS FOR BETTER FORESTY,
11                                      AMENDED COMPLAINT FOR
                                        DECLARATORY AND INJUNCTIVE
12                    Plaintiffs,       RELIEF
        v.
13                                      (National Environmental Policy Act, 42
    UNITES STATES FOREST SERVICE and the   U.S.C. §§ 4321 *et seq.*, National Forest
14  UNITED STATES FISH AND WILDLIFE    Management Act, 16 U.S.C. §§ 1601, *et*
    SERVICE,                           *seq.*, Healthy Forests Restoration Act, 16
15                                      U.S.C. §§ 6501 *et seq.*, Administrative
                      Defendants.       Procedure Act, 5 U.S.C. §§ 701 *et seq.*,
16                                      Endangered Species Act, 16 U.S.C. §§ 1531
                                        *et seq.*)
17

18

19

20

21

22

23

24

    AMENDED COMPLAINT                                                1

1

**STATEMENT OF THE CASE**

2      1.  Defendants have approved a forest management project, known as the "Pettijohn

3  Late Successional Reserve Habitat Improvement and Fuels Reduction Project" (hereinafter

4  "Pettijohn Project" or "the Project"). As part of the Project's actions, Defendants plan to cut

5  timber in an area designated as critical habitat for the Northern Spotted Owl and which is

6  currently inhabited by several pairs of Northern Spotted Owls ("NSO" or "Spotted Owl"), a

7  species listed under the Endangered Species Act ("ESA"). The Project is located in northern

8  California and wholly within the Shasta-Trinity National Forest ("STNF" or "the Forest").

9      2.  Plaintiffs allege that, in approving the Pettijohn Project, Defendants have violated

10  the ESA, the National Forest Management Act ("NFMA"), the National Environmental

11  Policy Act ("NEPA"), the Healthy Forests Restoration Act ("HFRA") and the regulations

12  implementing these statutes within the meaning of the Administrative Procedure Act

13  ("APA").

14      3.  Plaintiffs seek relief declaring Defendants' respective approvals of the Pettijohn

15  Project violates the ESA, NFMA, NEPA, HFRA and the APA, vacating the final decision by

16  Defendant United States Forest Service ("USFS") to approve and implement the Project, and

17  enjoining Defendants from implementing the Project pending further review of the Project

18  and compliance with all applicable provisions of such laws.

19

**JURISDICTION**

20      4.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331(a) (action for declaratory

21  and injunctive relief arising under the Constitution and laws of the United States); 28 U.S.C.

22  §§ 2201, 2202 (power to issue declaratory or injunctive relief in cases of actual controversy);

23  and 5 U.S.C. §§ 702-706, because (1) the action arises under the laws of the United States,

24

AMENDED COMPLAINT                                             2

1     (2) each Defendant is sued in its official capacity, and (3) there is a present, actual and

2     justiciable controversy between the parties.

3         5.    Plaintiffs commented on and objected to the Pettijohn Project, and in doing so,

4     Plaintiffs have exhausted all administrative remedies available to them as required by the

5     APA. The challenged agency action is final and subject to this Court's review pursuant to 5

6     U.S.C. §§ 702, 704, and 706.

7         6.    This Court is vested with jurisdiction to enforce the provisions of the ESA or any

8     regulation issued thereunder pursuant to Section 11(g)(1) of the ESA. 16 U.S.C. §

9     1540(g)(1). As required by Section 11(g)(2), Plaintiff has provided Defendants with written

10     notice of their alleged violations of the ESA at least sixty (60) days prior to the

11     commencement of this action. 16 U.SC. § 1540(g)(2)(A).

12                            **VENUE**

13         7.    Venue properly rests in the Eastern District of California pursuant to 28 U.S.C.

14     § 1391(e), 5 U.S.C. § 703 (APA), pursuant to 28 U.S.C. § 1391(e)(2) (NEPA and NFMA

15     alleged violations), pursuant to 16 U.S.C. § 1540(g)(3)(A)  (ESA alleged violations), and 16

16     U.S.C. §6516(a) (HFRA alleged violations).

17                            **PARTIES**

18         8.    Plaintiff CONSERVATION CONGRESS is a non-profit 501(c)(3) organization

19     incorporated in the State of California, dedicated to maintaining, protecting, and restoring the

20     native ecosystems of northern California. Conservation Congress has a longstanding

21     organizational interest in the proper and lawful management of National Forests located in

22     northern California, including the STNF. Conservation Congress also has an organizational

23     interest in the protection of the Northern Spotted Owl. Conservation Congress's members,

24

    AMENDED COMPLAINT                                                     3

1    staff, and board members participate in a wide range of aesthetic, scientific, business, and

2    recreational activities, such as hiking, fishing, hunting, photography, wildlife viewing,

3    appreciation of scenery, and bird watching, including attempts to view and appreciate the

4    Northern Spotted Owl in the Forest, including the specific federal lands involved in the

5    Pettijohn Project, and have concrete plans to continue these activities.  The organization's

6    membership includes professional photography businesses and freelance photographers who

7    earn income by photographing in northern California's National Forests, including the

8    Forest.  Conservation Congress' members, staff, and board members pursue, and have

9    concrete plans to continue pursuing, these aesthetic, scientific business and recreational

10   activities in the Forest, including on the lands involved in the Pettijohn Project.  These

11   intersects of Conservation Congress, its members, officers, and staff are substantial and are

12   adversely affected by Defendants' failure to comply with the ESA, NFMA, HFRA and

13   NEPA.  The requested relief will redress the injuries of Conservation Congress and its

14   members, staff, and board members.

15        9.  Plaintiff Citizens for Better Forestry (CBF) was formed in 1985 by people living

16   in and near the STNF to respond to the development of the new Forest Plan.  CBF has

17   approximately about 300 members.  The STNF Forest Plan Final Environmental Impact

18   Statement contains an alternative that was proposed by CBF (Alternative CBF) as one of the

19   alternatives.  CBF has continued to be involved in providing guidance to the STNF regarding

20   the management of the forest.  CBF's membership is comprised of people who rely on the

21   STNF for recreation, jobs, and products, including the area of the Pettijohn Project, and

22   whose interests will be adversely affected by Defendants' failure to comply with the ESA,

23

24

AMENDED COMPLAINT                                                                        4

1    NFMA, HFRA and NEPA.  The requested relief will redress the injuries of CBF and its

2    members, officers, and staff.

3        10. Defendant United States Forest Service ("USFS") is a federal agency with the

4    U.S. Department of Agriculture.  USFS is responsible for the management of the National

5    Forests, including the STNF.  As part of its management responsibility USFS must insure

6    that activities it conducts or authorizes on the STNF comply with the ESA, NFMA, HFRA

7    and NEPA.  USFS authorized the Pettijohn Project.

8        11. Defendant United States Fish and Wildlife Service ("USFWS") is a federal

9    agency within the U.S. Department of the Interior.  The Secretary of the Interior has

10   delegated to the USFWS responsibility for administration and implementation of the ESA.

11   Under Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), the USFWS must engage in a

12   process known as "consultation" with other federal agencies, such as USFS, to insure that

13   any action authorized, funded or carried out by such agency is not likely to jeopardize the

14   continued existence of any endangered or threatened species or result in the destruction or

15   adverse modification of any designated critical habitat of such species.  In this case, USFS

16   engaged in consultation with USFWS concerning the Pettijohn Project.

17                              **GOVERNING LAW**

18                        **The Endangered Species Act (ESA)**

19       12. "As it was finally passed, the Endangered Species Act of 1973 represented the

20   most comprehensive legislation for the preservation of endangered species ever enacted by

21   any nation."  *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978).

22       13. The purpose of the ESA is to "provide a means whereby the ecosystems upon

23   which endangered species and threatened species depend may be conserved, [and] to provide

24

AMENDED COMPLAINT                                                                        5

1   a program for the conservation of such endangered and threatened species ….”  16 U.S.C.  §

2   1531(b).

3         14. The ESA defines conservation as “the use of all methods and procedures which

4   are necessary to bring any endangered species or threatened species to the point at which the

5   measures provided pursuant to [the ESA] are no longer necessary.”  16 U.S.C. § 1532(3).

6         15. A species is listed as “endangered” if it is “likely to become an endangered

7   species within the foreseeable future throughout all or a significant portion of its range,”  16

8   U.S.C. § 1532(6), and as "threatened" if it is "likely to become an endangered species within

9   the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. §

10  1532(20).

11        16. The USFWS is required to list as either threatened or endangered any species

12  facing extinction. A species may be listed due to any one or any combination of, the

13  following five factors:  (1) the present or threatened destruction, modification, or curtailment

14  of the species’ habitat or range; (2) overutilization for commercial, recreational, scientific, or

15  educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory

16  mechanisms; or (5) other natural or manmade factors affecting the species’ continued

17  existence.  16 U.S.C. §§ 1533(a)(1)(A)-(E).

18        17. In considering the five listing factors, the USFWS must employ “the best

19  available scientific and commercial information regarding a species’ status, without reference

20  to possible economic or other impacts of such determination.”  50 C.F.R. § 424.11(b).

21        18. Because the objective of the ESA is to enable listed species not merely to survive,

22  but also to recover from their threatened or endangered status, the USFWS is required to

23  designate protected "critical habitat" for all listed species to achieve this end. 16 U.S.C. §

24

AMENDED COMPLAINT                                                                6

1    1533(a)(3); *Bennett v. Spear*, 520 U.S. 154, 157-58 (1997) ("[T]he objective of the ESA is to

2    enable listed species not merely to survive, but to recover from their endangered status. To

3    achieve this objective, Congress required the Secretary of the Interior to designate a 'critical

4    habitat' for all listed species.").

5          19. Critical habitat is defined as:

6          "(a) the specific areas within the geographic area occupied by the species, at the time
           it is listed in accordance with the [ESA], on which are found those physical or
7          biological features (I) essential to the conservation of the species and (II) which may
           require special management considerations or protection; and

8
           (b) specific areas outside the geographic area occupied by the species at the time it is
9          listed in accordance with the [ESA], upon a determination by the Secretary that such
           areas are essential for the conservation of the species."16 U.S.C. § 1532(5)(A).

10
           20. As in listing decisions, in decisions to designate critical habitat, the USFWS must
11
     make its decision "on the basis of the best scientific data available," but, unlike listing
12
     decisions, in designating critical habitat USFWS must also consider "the economic impact,
13
     and any other relevant impact of specifying any particular area as critical habitat." 16 U.S.C.
14
     § 1533(b)(2).
15
           21. In order to encourage the recovery of listed species, Section 4(f) of the ESA
16
     requires the USFWS to "develop and implement [recovery] plans for the conservation and
17
     survival of [all listed] endangered species and threatened species . . . unless [it] finds that
18
     such a plan will not promote the conservation of the species," including "a description of
19
     such site-specific management actions as may be necessary to achieve the plan's goal." 16
20
     U.S.C. § 1533(f).
21
           22. Section 7 of the ESA requires defendant USFS, in consultation with defendant
22
     USFWS, to insure that any action authorized, funded, or carried out by the USFS is not likely
23
     to (1) jeopardize the continued existence of any endangered species or threatened species

24

AMENDED COMPLAINT                                                                              7

1   (whether or not critical habitat has been designated), or (2) result in the destruction or

2   adverse modification of designated critical habitat of such species. 16 U.S.C. § 1536(a)(2).

3       23. Section 7 of the ESA mandates that all Federal agencies involved in the

4   consultation process must "use the best scientific and commercial data available" in fulfilling

5   their obligations under the statute. 16 U.S.C. §§ 1536(a)(2), 1536(c)(1). The "best available

6   scientific and commercial data" standard requires that a Federal agency must consider all

7   available information. *San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581,

8   602 (9th Cir. 2014).

9       24. To comply with ESA Section 7(a)(2), an action agency, such as the USFS in the

10  present case, generally must prepare a document called a "biological assessment" ("BA"). 16

11  U.S.C. § 1536(c)(1).

12      25. The BA informs the action agency in its initial determination whether any listed

13  species or critical habitat is likely to be affected by the proposed action, 16 U.S.C. §

14  1536(c)(1); 50 C.F.R. § 402.12(a). If the proposed agency action may affect a listed species

15  or critical habitat, the action agency must engage in "formal consultation" with the USFWS.

16  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

17      26. If the action agency and the USFWS engage in formal consultation, then the

18  USFWS prepares a document known as a biological opinion ("BO") to evaluate whether the

19  proposed action is likely to jeopardize the continued existence of a listed species or adversely

20  modify its critical habitat.  50 C.F.R. § 402.14(a).

21      27. The BO must be based on the "best scientific and commercial data available," 16

22  U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d), must include a summary of the information on

23  which it is based and must adequately detail and assess how the proposed action affects listed

24

AMENDED COMPLAINT                                                        8

1   species and their critical habitats, 50 C.F.R. § 402.14(h), and must also include an evaluation

2   of the "cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g)(3).

3       28. In the BO, the USFWS must provide its opinion whether the proposed action

4   "will jeopardize the continued existence" of a listed species, or result in the destruction or

5   "adverse modification" of designated critical habitat (a "jeopardy opinion"). If the USFWS

6   issues a jeopardy opinion, then the BO must include "reasonable and prudent alternatives," if

7   any. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(2).

8       29. Either the action agency or the USFWS must "reinitiate" consultation "If new

9   information reveals effects of the action that may affect listed species or critical habitat in a

10   manner or to an extent not previously considered," 50 C.F.R. § 402.16(b), or "[i]f a new

11   species is listed or critical habitat designated that may be affected by the identified action."

12   50 C.F.R. § 402.16(d).

13       30. The ESA prohibits "take" of species that are listed as endangered. 16 U.S.C. §

14   1538(1)(B). The USFWS has extended the "take" prohibition to threatened species through

15   regulation.  50 C.F.R. § 17.31(a).

16       31. "Take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or

17   collect, or attempt to engage in any such conduct. 16 U.S.C. § 1532(19). The terms "harass"

18   and "harm" are further defined in the ESA's implementing regulations. "Harass" means an

19   intentional or negligent act or omission which creates the likelihood of injury to wildlife by

20   annoying it to such an extent as to significantly disrupt normal behavioral patterns which

21   include, but are not limited to, breeding, feeding, or sheltering. "Harm" means an act which

22   actually kills or injures wildlife. Such act may include significant habitat modification or

23

24

1    degradation where it actually kills or injures wildlife by significantly impairing essential

2    behavioral patterns, including breeding, feeding or sheltering. 50 C.F.R. § 17.3.

3        32.    If a BO concludes that the action is not likely to jeopardize the continued

4    existence of a listed species, and will not result in the destruction or adverse modification of

5    the designated critical habitat of a species, but will result in the incidental take of a protected

6    species, the BO must provide an "incidental take statement" ("ITS") specifying the amount

7    or extent of such incidental taking on the listed species, and any "reasonable and prudent

8    measures" that the USFWS considers necessary or appropriate to minimize such impact, and

9    setting forth the "terms and conditions" that must be complied with by the action agency, in

10    this case USFS, to implement those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

11        33. Without a BO and an ITS from the USFWS, the USFS is not authorized to "take"

12    any listed species, nor may it jeopardize the species or adversely modify its critical habitat.

13        34. The regulatory definition of "destruction or adverse modification" of critical

14    habitat is "a direct or indirect alteration that appreciably diminishes the value of critical

15    habitat for the conservation of a listed species. Such alterations may include, but are not

16    limited to, those that alter the physical or biological features essential to the conservation of a

17    species or that preclude or significantly delay development of such features." 50 C.F.R. §

18    402.02 (Revised Feb. 1, 2016).

19        35.    In evaluating the potential for a proposed action to adversely modify critical

20    habitat, FWS must consider effects on either the survival or the recovery of the listed species.

21    *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*, 378 F.3d 1059, 1069-70 (9th

22    Cir. 2004), *amended by* 387 F.3d 968 (9th Cir. 2004). Therefore, a key part of the critical

23

24

    AMENDED COMPLAINT        10

1    habitat analysis process is how the proposed action may affect recovery of the listed species,

2    for example, by delaying recovery or making recovery less likely to occur.

3        36. Physical or biological features ("PBFs") are those physical and biological features

4    "that are essential to the conservation of a given species and may require special management

5    considerations or protection." 50 C.F.R. § 424.12(b).

6        37. An action may destroy or adversely modify critical habitat if it adversely affects

7    the essential PBFs to an extent that the intended conservation function or purpose of critical

8    habitat for the species is appreciably reduced. 50 C.F.R. § 402.02 (Revised Feb. 1, 2016).

9                      **The National Environmental Policy Act (NEPA)**

10       38. NEPA is our "basic national charter for protection of the environment." 40 C.F.R.

11   § 1500.1(a).

12       39. NEPA and its implementing regulations promulgated by the Council on

13   Environmental Quality require federal agencies to prepare an environmental impact

14   statement ("EIS') for "every recommendation or report on proposals for legislation and other

15   major Federal actions significantly affecting the quality of the human environment." 42

16   U.S.C. § 4332(2)(C), 40 C.F.R. § 1508.11.

17       40. NEPA has "twin aims."  First, it requires federal agencies "to consider every

18   significant aspect of the environmental impact of a proposed action. Second, it ensures that

19   the agency will inform the public that it has indeed considered environmental concerns in its

20   decisionmaking process." *Kern v. BLM*, 284 F.3d 1062, 1066 (9th Cir. 2002) (*quoting*

21   *Baltimore Gas & Electric Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983)).

22

23

24

AMENDED COMPLAINT                                                         11

1    41. The primary purpose of a NEPA analysis "is to serve as an action-forcing device

2    to insure that the policies and goals defined in [NEPA] are infused into the ongoing programs

3    and actions of the Federal Government." 40 C.F.R. § 1502.1.

4    42. "NEPA procedures must insure that environmental information is available to

5    public officials and citizens before decisions are made and before actions are taken . . . .

6    Accurate scientific analysis, expert agency comments, and public scrutiny are essential to

7    implementing NEPA." 40 C.F.R. § 1500.1(b).

8    43. NEPA requires federal agencies to analyze the direct, indirect, and cumulative

9    impacts of proposed actions. 40 C.F.R. §§ 1508.7, 1508.8.

10    **The National Forest Management Act (NFMA)**

11    44. The NFMA requires the USFS to create a comprehensive Forest Plan for each

12    national forest. 16 U.S.C. § 1604(a), (e); *Inland Empire Pub. Lands Council v. United States*

13    *Forest Serv.*, 88 F.3d 754, 757 (9th Cir. 1996) (USFS first develops Forest Plan or Land

14    Resource Management Plan consistent with requirements of NFMA); *Lands Council v.*

15    *Powell*, 395 F.3d 1019, 1032-33 (9th Cir. 2005).  A forest plan is also referred to as a Land

16    Resource Management Plan ("LRMP").

17    45. Once the Forest Plan or LRMP is adopted, NFMA prohibits any site-specific

18    activities that are inconsistent with the Forest Plan. *Inland Empire*, 88 F.3d at 757 ("[S]ite-

19    specific projects must be consistent with the stage-one, forest-wide plan."); *Lands Council,*

20    395 F.3d at 1033.

21    **The Healthy Forests Restoration Act (HFRA)**

22    46. The HFRA was passed in December 2003 (P.L. 108-148) with the stated goal "to

23    reduce delays and remove statutory barriers for projects on federal land that reduce

24

AMENDED COMPLAINT                                                                    12

1    hazardous forest fuels and improve forest health and vigor." One the six purposes of the

2    HFRA is "to protect, restore, and enhance forest ecosystem components to promote the

3    recovery of threatened and endangered species, improve biological diversity, and enhance

4    productivity and carbon sequestration." 16 U.S.C. § 6501(6)(A) – (C).

5          47. The HFRA requires that a project "fully maintain, or contribute toward the

6    restoration of, the structure and composition of old growth stands according to the pre-fire

7    suppression old growth conditions characteristic of the forest type, taking into account the

8    contribution of the stand to landscape fire adaptation and watershed health, and retaining

9    large trees contributing to old growth structure."  16 U.SC. § 6512(e)(2).

10          48. The HFRA specifically includes a requirement to protect "Large" trees:

11          "Except in old growth stands where the management direction is consistent with
              subsection (e)(2), the Secretary shall carry out a covered project in a manner that –
12          (A) focuses largely on small diameter trees, thinning, strategic fuel breaks, and
              prescribed fire to modify fire behavior, as measured by the projected reduction of
13          uncharacteristically severe wildfire effects for the forest type (such as adverse soil
              impacts, tree mortality or other impacts); and (B) maximizes the retention of large
14          trees, as appropriate for the forest type, to the extent that the trees promote fire-
              resilient stands."  16 U.S.C. § 6512(f).

15                          **The Administrative Procedure Act (APA)**

16          49. The Court's review of plaintiffs' NEPA, NFMA, and certain ESA claims is

17    governed by the APA.

18          50.  The APA provides "[a] person suffering legal wrong because of an agency

19    action, or adversely affected or aggrieved by agency action within the meaning of a relevant

20    statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

21          51. The APA provides "the reviewing court shall . . . hold unlawful and set aside

22    agency actions, findings, and conclusions found to be . . . arbitrary, capricious, or an abuse of

23

24    AMENDED COMPLAINT                                                        13

1    discretion or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or which have

2    been taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

3                              **PROCEDURAL BACKGROUND**

4           52. The USFS issued the Final EIS for the Pettijohn Project in May 2012.

5           53. The USFS issued the Record of Decision for the Pettijohn Project in March 2013.

6           54. On May 12, 2013, Plaintiffs filed the complaint initiating this litigation, alleging

7    violations of the ESA, NEPA, and the NFMA in connection with the Pettijohn Project.

8           55. On June 27, 2013, the USFS requested additional consultation with the Fish and

9    Wildlife Service on the Pettijohn Project pursuant to Section 7 of the ESA.

10          56. On July 8, 2013, the Court stayed this case on stipulation of the parties to allow

11   for the USFS and USFWS to complete the reinitiated Section 7 consultation process and any

12   attendant administrative process otherwise required by law.

13          57. On May 1, 2017, the USFS issued the "March 2017 Pettijohn Project Wildlife

14   Supplemental Information Report [ ] for the Wildlife Biological Assessment & Biological

15   Evaluation for the Pettijohn LSR Project" ("2017 WSIR").

16          58. In April, 2018, the USFWS sent the "Supplemental Biological Opinion" ("2018

17   SBO") to the USFS, which concluded the reinitiated formal consultation for the Pettijohn

18   Project.

19          59. On July 9, 2018, the Court lifted the stay, according to the parties' stipulation.

20          60. On March 27, 2019, the USFS issued a Supplemental Information Report ("2019

21   SIR") that assessed new information and changed conditions relevant to the Pettijohn Project.

22   The 2019 SIR included modifications to the Pettijohn Project.

23                              **FACTUAL ALLEGATIONS**

24

AMENDED COMPLAINT                                                          14

1

***Northern Spotted Owl***

2          61. Historically, the Northern Spotted Owl, *Strix occidentalis caurina*, (sometimes

3     referred to as "NSO" or the "Owl") ranged in structurally complex forests, commonly

4     referred to as "old growth" forests, from southwest British Columbia through the Cascade

5     Mountains and coastal ranges in Washington, Oregon and California, as far south as Marin

6     County, California.  Due to the widespread loss of Northern Spotted Owl habitat, the

7     inadequacy of existing regulatory mechanisms to conserve the species, and its precipitous

8     decline, the USFWS listed the Northern Spotted Owl as a threatened species under the ESA

9     in 1990. 55 Fed. Reg. 26114 (June 26, 1990).

10          62. Today, with the continued destruction of old growth forests, the rangewide

11     Northern Spotted Owl population is in decline as a result of decades of habitat loss and

12     degradation and the recent expansion of barred owl populations throughout its range.

13          63. In published meta-analyses the USFWS found that the average annual rate of

14     decline in the rangewide population of the Northern Spotted Owl increased from 2.8% in

15     2011 to 3.8% in 2015, and the negative rate of population change for the Northern Spotted

16     Owl in California increased significantly from 32% to 55% in the same time period.

17          64. Recent studies indicate that the Northern Spotted Owl population in northern

18     California is declining 5.5% per year.

19          65. In response to a 2012 petition to uplist the Northern Spotted Owl from threatened

20     to endangered status under the ESA, in April 2015 the USFWS determined that the petition

21     presented substantial information indicating the uplisting may be warranted due to a number

22     of listing factors. 80 F.R. 19259 - 19263.

23

***Late Successional Reserves***

24

AMENDED COMPLAINT                                                                                    15

1    66. The conservation strategy for the Northern Spotted Owl, established by the USFS

2    in the 1994 Northwest Forest Plan ("NWFP"), includes the protection of large blocks of

3    habitat to facilitate the survival of clusters of breeding Spotted Owl pairs, the distribution of

4    protected areas across a variety of ecological conditions, and the provision of suitable

5    "connectivity habitat," within the surrounding "matrix" of less protected lands, to support the

6    movement of  Owls across the landscape between reserves, thus increasing their chances for

7    survival.

8    67. The protected blocks of habitat established in the NWFP are referred to as Late

9    Successional Reserves ("LSRs") and are areas in which logging and other ground-disturbing

10   activities are generally prohibited to protect the ecosystem and conserve the Owl and other

11   species.

12   68. The LSR land allocation is incorporated into the STNF LRMP.

13   ***Critical Habitat Designation for the Northern Spotted Owl***

14   69. The USFWS initially designated critical habitat for the Northern Spotted Owl in

15   1992. 57 Fed. Reg. 1796.

16   70. In 2008, USFWS revised its critical habitat designation for the Northern Spotted

17   Owl, reducing by approximately one-third the amount of land in northern California that it

18   considered critical habitat for the Owl but continuing the designation of the Pettijohn Project

19   area as Northern Spotted Owl critical habitat. 73 Fed. Reg. 47326.

20   71. In October 2010, the U.S. District Court for the District of Columbia entered an

21   order requiring USFWS to re-consider its 2008 rule revising the Owl's critical habitat and

22   issue a new proposed critical habitat rule by November 15, 2011 and a new final critical

23

24

AMENDED COMPLAINT                                                            16

1    habitat rule by November 15, 2012. 76 Fed. Reg. 38576 (citing *Carpenters' Industrial*

2    *Council v. Salazar*, Case No. 1:08-cv-1409-EGS (D.D.C.)).

3         72. The new final critical habitat rule for the Northern Spotted Owl was promulgated

4    in December 2012 and went into effect on January 3, 2013 ("2012 CH Rule"). 77 Fed. Reg.

5    71875.

6         73. The 2012 CH Rule defines the primary constituent elements "essential to the

7    conservation of the NSO as forested areas that are used or likely to be used for nesting,

8    roosting, foraging, or dispersing."

9         74. The 2012 CH Rule indicates that the destruction or adverse modification

10   determination is made at the scale of the entire critical habitat network; however "[a]

11   proposed action that compromises the capability of a subunit or unit to fulfill its intended

12   conservation function or purpose (e.g., demographic, genetic, or distributional support for

13   NSO recovery) could represent an appreciable reduction in the conservation value of the

14   entire designated critical habitat."

15                    ***Recovery Planning for the Northern Spotted Owl***

16        75. In 2008, the USFWS issued an ESA Recovery Plan for the Northern Spotted Owl.

17   73 Fed. Reg. 29471.

18        76. This 2008 Recovery Plan was challenged in court, and the USFWS moved the

19   U.S. District Court for the District of Columbia to vacate and remand the Recovery Plan to it

20   for further review.

21        77. In September 2010, USFWS released a new draft revised Recovery Plan for the

22   Northern Spotted Owl. 75 Fed. Reg. 56131.

23

24

     AMENDED COMPLAINT                                                                    17

1    78. In July 2011, USFWS issued a final revised Recovery Plan for the Northern

2    Spotted Owl ("2011 Recovery Plan"). 76 Fed. Reg. 38575.

3    79. The 2011 Recovery Plan recognizes "past habitat loss and competition from

4    Barred Owls, *Strix varia*, as the most pressing threats to Spotted Owl persistence." 76 Fed.

5    Reg. 38575.

6    80. To address these threats, the 2011 Recovery Plan recommends increased habitat

7    protection for the Owl in both occupied and unoccupied areas.

8    81. The 2011 Recovery Plan requires additional analysis of impacts to the Northern

9    Spotted Owl resulting from projects which impact its prey species and cautions that "active

10   management projects," such as the Pettijohn Project, should explicitly evaluate the short-term

11   impacts to the Northern Spotted Owl and its prey while considering alleged long-term

12   ecological benefits of such projects.

13   82. The 2011 Recovery Plan identifies thirty-three specific "Recovery Actions" that

14   are the USFWS' recommendations to guide the activities needed to achieve the criteria

15   necessary to recover the Northern Spotted Owl to the point where the species no longer needs

16   the protection of the ESA.

17   83. Standard and Guideline 25(h) of the STNF LRMP requires consistency with an

18   individual species' recovery plan, such as the 2011 Recovery Plan, in any action to maintain

19   and/or enhance habitat for threatened and endangered species.

20   ***Section 7 Consultation History of the Pettijohn Project***

21   84. On January 24, 2011, the USFS submitted a "Wildlife Biological Assessment &

22   Biological Evaluation for the Pettijohn LSR Project" to the USFWS for informal consultation

23   under Section 7 of the ESA for the Pettijohn Project, which the USFWS accepted as "final"

24

AMENDED COMPLAINT                                                                          18

1    on February 14, 2011 ("2011 BA"). Regarding the Northern Spotted Owl, the 2011 BA

2    states: "In the short-term, it was determined that implementation of the proposed action may

3    affect and would likely adversely affect the NSO through reduction of habitat quality."

4          85. In 2012, the USFWS prepared a draft Biological Opinion for the Pettijohn Project

5    ("2012 BO").

6          86. In 2012, the USFS prepared a "Supplement to the Wildlife Biological

7    Assessment" dated April 4, 2012 ("2012 SBA") to provide additional information regarding

8    the Pettijohn Project to inform the USFWS' finalization of the 2012 BO.

9          87. On June 27, 2013, the USFS sent a written request to the USFWS for reinitiation

10    of consultation on the Spotted Owl and its critical habitat.

11          88. On August 13, 2013, the USFS sent a "draft Supplemental BA" to the USFWS,

12    which was followed by several years of back-and-forth communications, discussions and

13    comments between the USFS and the USFWS regarding the Spotted Owl and its critical

14    habitat.

15          89. On May 1, 2017, the USFS sent the draft ("2017 WSIR") to the USFWS the to

16    update and supplement information in the 2011 BA and 2012 SBA. The WSIR concluded

17    that "the proposed actions may affect but would not likely adversely modify Designated

18    Critical Habitat for the northern spotted owl."

19          90. The USFWS responded to the USFS' request for "technical assistance" with the

20    draft 2017 WSIR on May 10, 2017, and stating that it was the responsibility of the USFS to

21    request the reinitiation of formal consultation for the Pettijohn Project. On June 16, 2017, the

22    USFS requested that the USFWS reinitiate formal consultation for the Pettijohn Project.

23

24

AMENDED COMPLAINT               19

1    91. In April, 2018, the USFWS sent the 2018 SBO to the USFS which concluded the

2    reinitiated formal consultation for the Pettijohn Project. The 2018 SBO concluded that

3    "implementation of the selected alternative would adversely affect NSOs and their critical

4    habitat, but not to such an extent that it would jeopardize the continued existence of the

5    species or adversely modify its designated critical habitat." The 2018 BO included an

6    Incidental Take Statement that permitted "take in the form of harassment" of four (4) adult

7    Owls from project activities within the home ranges of two of the ten Activity Centers

8    located within the Action Area.

9    92. Substantially all of the Section 7 consultation on behalf of the USFWS was

10   handled through the Yreka Fish and Wildlife Service Office.

11   ***The Pettijohn Project***

12   93. The Pettijohn Project is located on the Weaverville Ranger District, Trinity River

13   Management Unit, STNF, about five miles northeast of Weaverville and Lewiston,

14   California.

15   94. The project lies largely within the Clear Creek LSR (RC-334), and between

16   Lewiston Lake, Trinity Lake and the Trinity River.

17   95. The "action area" of the Pettijohn Project "project area" is approximately 25,270

18   acres, and includes 16,326 acres of National Forest System land and 8,944 acres of private

19   land.

20   96. The "project area" as designated by the USFS encompasses about 13,162 acres of

21   National Forest System land and 8,409 acres of private land.

22

23

24

AMENDED COMPLAINT                                                                    20

1        97. The USFS asserts that the project area contains four "Wildland-Urban Interfaces"

2    (WUIs): 1) Weaverville, 2) Lewiston, 3) Trinity River Management Unit 2 and 4, and 4)

3    Trinity River Management Unit 12.  FEIS-2.

4        98. The stated "purpose and need" for the Pettijohn Project is to reduce fuel loads;

5    support the effectiveness and safety of fire suppression and/or prescribed fire through the

6    development of fuel management zones (FMZs); and accelerate the development of late-

7    successional and old-growth forest components.

8        99. The Pettijohn Project was developed and is authorized under Section 102(a)(5)(B)

9    of HFRA that authorizes projects to provide enhanced protection from catastrophic wildfire

10    for threatened or endangered species and their habitat. 16 U.S.C. § 6512(5)(B).

11        100.      As initially proposed, the Proposed Alternative (alternative 2) includes the

12    following activities: 958 acres of thinning including approximately 96 acres of thinning in

13    riparian reserve; 1,846 acres of fuel management zone ("FMZ") adjacent to roughly 36 miles

14    of existing roads; fuels reduction by prescribed burning on 101 acres; and piling and burning

15    of 11 acres in two areas outside the LSR. Construction of no more than 36 landings;

16    construction of 0.95 miles of temporary roads to access landings; and decommissioning of

17    2.3 miles of roads having negative effects on fish and water quality and which are difficult to

18    maintain. FEIS-8.  According to the 2019 SIR, the Pettijohn Project was amended to drop

19    121 acres, including 50 acres of thinning-from-below in habitat classified as nesting and

20    roosting and 71 acres in the FMZ in habitat classified as nesting and roosting.

21        101.      Forest Supervisor J. Sharon Heywood approved the Pettijohn Project via a

22    Record of Decision on March 13, 2013.

23

24

AMENDED COMPLAINT                                     21

1      102.      According to the 2012 BO and the 2018 SBO, the effects of the Pettijohn

2      Project on Owl critical habit will be to remove approximately six acres of Nesting/Roosting

3      habitat and six acres of Foraging habitat elements from short-term landing and temporary

4      road construction. Approximately 277 acres of Foraging habitat will be downgraded to

5      dispersal habitat, and 1,290 acres of Nesting/Roosting habitat and 119 acres of Foraging

6      habitat will be degraded in quality, but remain functional as nesting, roosting and foraging.

7      Approximately 34 acres of Nesting/Roosting habitat, and 28 acres of Foraging habitat, will

8      be benefitted by manual thinning treatments or prescribed fire.

9                           **CLAIM I**

10                           **(Both Defendants)**

11                **Violation of the ESA Section 7(a)(2) and the APA**

12                 **Failure to Use the Best Available Science**

13      103.      Plaintiffs incorporate by reference all preceding paragraphs.

14      104.      The Defendants have violated ESA Section 7(a)(2) by failing to use the

15      "best scientific and commercial data available" in their analysis of the effects of the Pettijohn

16      Project on the Northern Spotted Owl and its critical habitat, 16 U.S.C. § 1536(a)(2),

17      including, but not limited to, the violations described below.

18      105.      In establishing values for selected stand structural parameters used to

19      classify Nesting/Roosting and Foraging habitats in the analysis of Owl habitats in the

20      Pettijohn Project, and for other purposes in the analysis of the Project's effects on the Owl

21      and its critical habitat, the Defendants relied upon and applied the USFWS' 2009

22      "Regulatory and Scientific Basis for U.S. Fish and Wildlife Service Guidance for Evaluation

23      of Take for Northern Spotted Owls on Private Timberlands in California's Northern Interior

24      Region" ("2009 Guidelines").

1    106.    Although the Defendants relied upon and applied the 2009 Guidelines as

2    the "best available science" to define and provide values for suitable habitat conditions for

3    nesting/roosting, foraging and dispersal of the Owl, and for other purposes, in the 2018 SBO,

4    the 2017 WSIR, and other analyses, in fact the 2009 Guidelines were developed for the

5    purpose of ensuring timber harvest plans on private lands do not result in incidental take of

6    the Northern Spotted Owl, and are not the "best available science" or even applicable for the

7    purpose of analyzing the habitat conditions required for the conservation or recovery of the

8    Northern Spotted Owl.

9    107.    The suitable habitat values provided in the 2009 Guidelines are

10   inconsistent with standards and guidelines under other applicable planning and guidance

11   documents that provide standards and guidelines drafted to inform the conservation and

12   recovery of the Spotted Owl including, without limitation, the NWFP, the 2012 CH Rule, and

13   the 2011 Recovery Plan.

14   108.    In relying on the 2009 Guidelines, the Defendants failed to apply

15   guidelines that provide definitions and values for suitable habitats necessary to conserve and

16   recover the Owl contained in other applicable planning and guidance documents including,

17   without limitation, the NWFP, the 2012 CH Rule, and the 2011 Recovery Plan.

18   109.    In failing to use the best available scientific and commercial information,

19   the Defendants have taken agency action that is arbitrary, capricious, an abuse of discretion,

20   and otherwise not in accordance with Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), or

21   the procedures required by law in violation of the APA. 5 U.S.C. § 706(2)(A) & (D).

22

23

24

AMENDED COMPLAINT                                                                            23

110.     Plaintiffs are entitled to its reasonable fees, costs, and expenses associated with this litigation pursuant to the ESA, 16 U.S.C. § 1540(g) and/or Equal Access to Justice Act, 28 U.S.C. § 2412.

### CLAIM II

### (Both Defendants)

### Violation of ESA Section 7(a)(2) and the APA

### Failure to Avoid Jeopardy and Destruction or Adverse Modification of Critical Habitat

111.     Plaintiffs incorporate by reference all preceding paragraphs.

112.     Section 7(a)(2) of the ESA requires Defendant USFS, in consultation with Defendant USFWS, to insure that implementation of the Pettijohn Project is not likely to jeopardize the continued existence of the threatened Northern Spotted Owl, or result in the destruction or adverse modification of designated critical habitat of such species. 16 U.S.C. § 1536(a)(2). The Defendants are likely to jeopardize the survival and recovery of the Owl, or destroy or adversely modify its Critical Habit, in violation of Section 7(a)(2) in a variety of ways including, without limitation, as described below.

113.     By using a flawed and inaccurate environmental baseline in the 2011 BA, 2012 SBA, 2017 WSIR and the 2018 SBO by failing to accurately account for historical losses of Northern Spotted Owl suitable habitat and Critical Habitat from wildfires and timber harvesting that significantly changes the baseline acreages of suitable Owl habitat and Critical Habitat rangewide as well as for the California Klamath Physiographic Province, Critical Habitat Unit 11 and Subunit ICC-7, which in turn under-estimates the effect of the Pettijohn Project on Critical Habitat at the rangewide, province, CHU and Subunit scales.

AMENDED COMPLAINT                                                                    24

1       114.      By establishing suitable habitat values at or below the minimum

2  thresholds necessary for the conservation and recovery of the Owl, in reliance on the 2009

3  Guidelines that are not applicable to the determinations required under Section 7(a)(2),

4  inadequate to inform the planning and implementation of the Project activities likely to affect

5  the Owl and its Critical Habitat, are inconsistent with standards and guidelines applicable

6  under other planning and guidance documents (including, without limitation, the 2012 CH

7  Rule, the 2011 Recovery Plan, and the NWFP), and inferior to other available information.

8       115.      By establishing and using flawed, inaccurate and/or minimal habitat

9  values (including, without limitation, values for Basal Area, Quadratic mean diameter,

10  "Large" trees/acre, and Canopy closure/cover) to inform "thinning from below" and other

11  Project actions, the Defendants are likely to jeopardize the survival and recovery of the Owl,

12  or destroy or adversely modify its Critical Habit, by inaccurately analyzing the effects of,

13  without limitation, (a) lowering the quality of existing "High Quality" Nesting/Roosting

14  habitat; (b) lowering the quality of existing Foraging habitat to "Low-quality" Foraging

15  habitat; (c) downgrading Foraging habitat to Dispersal habitat; (d) and the removal of

16  "Large" trees without establishing a definition or guideline based on size, age or other

17  determinable value to ensure retention of "Old Growth" in late-successional forest in the

18  Action Area.

19       116.      By reducing the quality of Nesting/Roosting and Foraging habitats without

20  the restoration of such habitats or creation of new habitat within a 50-year timeframe;

21       117.      By causing adverse effects to essential "physical and biological features"

22  (PBFs) described in the 2102 CH Rule to an extent that the intended conservation function or

23  purpose of the designated Critical Habitat for the Owl is appreciably reduced.

24

AMENDED COMPLAINT                      25

1        118.     By the removal of all snags, or retention of an insufficient amount or

2   quality of snags, within the FMZ to maintain suitable habitats for the Owl, and "Old Growth"

3   in late successional forest within the FMZ.

4        119.     By the removal of all vertical structure/understory, or retention of an

5   inadequate amount or complexity of vertical structure/understory, necessary to retain "Old

6   Growth" in late-successional forest in the Action Area.

7        120.     By failing to fully consider, apply or be consistent with the standards and

8   guidelines set forth in the 2011 Recovery Plan and 2012 CH Rule establishing minimum

9   values for Northern Spotted Owl Activity Centers when analyzing the direct and indirect

10   effects of the Project on such Action Areas and their resident Owls including, without

11   limitation, by ignoring or dismissing the adverse effects of the Project that reduced the

12   amount, quality or functionality of Nesting/Roosting and Foraging habitats within certain

13   Activity Centers, both occupied and historically occupied, located within the Action Area.

14        121.     By failing to fully consider, apply or be consistent with the guidance for

15   recovery of the Owl contained in the 2011 Recovery Plan including, without limitation,

16   Recovery Actions 10 and 32.

17        122.     By failing to establish an accurate and complete environmental baseline

18   for full and complete analysis of the effects of the Project on the Owl Critical Habitat

19   including, without limitation, inclusion of all past activities on private lands that have

20   adversely affected Owl suitable habitat within the Action Area, with particular attention to

21   private lands that are adjacent to, or within the range of, occupied and historically occupied

22   Activity Centers within the Action Area.

23

24

   AMENDED COMPLAINT                                 26

1        123.       By failing to include and consider the effects on future activities on private

2   lands within the Action Area that are reasonably certain to occur. 50 C.F.R. § 402.02.

3        124.       By the above-described conduct, the USFS and USFWS have each failed

4   to insure the effects of the Pettijohn Project will not jeopardize the continued existence of the

5   Northern Spotted Owl or adversely modify its designated critical habitat in violation of 16

6   U.S.C. § 1536(a)(2), and have taken agency action that is arbitrary, capricious, an abuse of

7   discretion, and otherwise not in accordance with the ESA and its implementing regulations or

8   the procedures required by law in violation of the APA, 5 U.S.C. § 706(2)(A) & (D).

9        125.       Plaintiffs are entitled to its reasonable fees, costs, and expenses associated

10   with this litigation pursuant to the ESA, 16 U.S.C. § 1540(g) and/or Equal Access to Justice

11   Act, 28 U.S.C. § 2412.

12                                    **CLAIM III**

13                          **(Both Defendants)**

14             **Violation of the ESA** 50 C.F.R. § 402.16(b)

15                **Failure to Reinitiate Consultation**

16        126.       Plaintiffs incorporate by reference all preceding paragraphs.

17        127.       Since the completion of consultation and the issuance of the USFS' 2017

18   WSIR and the USFWS' 2018 SBO, new information reveals effects of the Pettijohn Project

19   on the Northern Spotted Owl and/or its designated Critical Habitat in a manner and/or to an

20   extent not previously considered.

21        128.       Such new information includes, but is not limited to, the "Process Paper

22   for the Interim Baseline Adjustment for Northern Spotted Owl and its Critical Habitat: 2008

23   through 2018 Wildfires" (Dec. 20, 2018) ("2018 Baseline Adjustment"), prepared by the

24

1   USFWS Yreka Office in cooperation with the USFS, to "update and assess habitat conditions

2   (baseline) for northern spotted owl (NSO), and to update and asses[s] the status of the

3   species' designated critical habitat."

4        129.     The 2018 Baseline Adjustment provides new information on the impacts

5   of wildfires from 2010 – 2018 to Northern Spotted Owl "suitable" habitat and to its Critical

6   Habitat in the STNF and three other National Forests in northern California.

7        130.     The 2018 Baseline Adjustment provides an "Interim Baseline" that is the

8   USFWS' best current estimate of the amount of suitable Northern Spotted Owl habitat

9   (including Dispersal habitat) in the four National Forests.

10        131.     Further, the 2018 Baseline Adjustment provides a "Critical Habitat

11   Baseline Adjustment" that "utilizes the best available information to date to describe the

12   change in and current habitat conditions for the Owl from wildfires within the California

13   Klamath, California Cascades, and California Coast physiographic provinces, allowing the

14   [Yreka Fish and Wildlife Service Office] . . . to better assess the status of the species and its

15   critical habitat."

16        132.     The 2018 Baseline Adjustment states that between 2007 and 2018 the four

17   National Forests lost a combined 97,364 acres, or 4%, of their Northern Spotted Owl suitable

18   habitat. During the same period, the STNF experienced a loss of 7% of its Northern Spotted

19   Owl suitable habitat.

20        133.     The 2018 Baseline Adjustment states that between 2010 and 2018

21   wildfires reduced the Nesting/Roosting habitat in Critical Habitat Unit 11 by -42.2%,

22   Foraging habitat was reduced by -22.2% and Dispersal habitat by -31.4%. In Critical Habitat

23

24

AMENDED COMPLAINT                         28

1    Subunit ICC 7, between 2012 and 2018 wildfires reduced Nesting/Roosting habitat by -4,522

2    acres, Foraging habitat by -70 acres, and Dispersal habitat by -1,476 acres.

3           134.     Applying the new information provided by the 2018 Baseline Adjustment

4    significantly effects the environmental baseline used in the 2017 WSIR and the 2018 SBO by

5    changing the baseline acreages of suitable Owl habitat and Critical Habitat rangewide as well

6    as for the California Klamath Physiographic Province, Critical Habitat Unit 11 and Subunit

7    ICC-7, which in turn under-estimates the effects of the Pettijohn Projects on Critical Habitat

8    at the rangewide, province, CHU and Subunit scales.

9           135.     By failing to reinitiate consultation following the availability of the new

10   information contained in the 2018 Baseline Adjustment as required under 50 C.F.R. §

11   402.16(b), the USFS and USFWS have failed to insure the effects of the Pettijohn Project

12   will not jeopardize the continued existence of the Northern Spotted Owl or adversely modify

13   its designated critical habitat in violation of 16 U.S.C. § 1536(a)(2), and have taken agency

14   action that is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance

15   with the ESA and its implementing regulations, or the procedures required by law in

16   violation of the APA. 5 U.S.C. § 706(2)(A) & (D).

17          136.     Plaintiffs are entitled to its reasonable fees, costs, and expenses associated

18   with this litigation pursuant to the ESA, 16 U.S.C. § 1540(g) and/or Equal Access to Justice

19   Act, 28 U.S.C. § 2412.

20                                      **CLAIM IV**

21                                      **(USFWS)**

22              **Violation of the ESA Section 1536(b)(4) and the APA**

23              **Arbitrary Issuance of Incidental Take Statement**

24

AMENDED COMPLAINT                                                    29

1     137.     Plaintiffs incorporate by reference all preceding paragraphs.

2     138.     The ESA prohibits "take" of species listed as endangered. 16 U.S.C. §

3     1538(a)(1)(B).  The USFWS has extended this "take" prohibition to threatened species by

4     regulation. 50 C.F.R. § 17.31(a). The USFWS lists the Northern Spotted Owl as threatened.

5     55 Fed. Reg. 26114.

6     139.     To "take" means to *harass*, *harm*, pursue, hunt, shoot, wound, kill, trap,

7     capture or collect, or attempt to engage in any such conduct. 16 U.S.C. § 1532(19) (*emphasis*

8     *added*).

9     140.     "Harass" means an intentional or negligent act or omission which creates

10    the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt

11    normal behavioral patterns which include, but are not limited to, breeding, feeding, or

12    sheltering. 50 C.F.R. § 17.3.

13    141.     "Harm" means an act which actually kills or injures wildlife. Such act may

14    include significant habitat modification or degradation where it actually kills or injures

15    wildlife by significantly impairing essential behavioral patterns, including breeding, feeding

16    or sheltering. *Id.*

17    142.     In the 2012 BO and the 2018 SBO, the USFWS determined that the

18    Pettijohn Project would take via harassment two pairs of adult Northern Spotted Owls in two

19    separate activity centers.

20    143.     Where the USFWS concludes, as it did here, that a proposed action will

21    not jeopardize the continued existence of a listed species or adversely modify its critical

22    habitat, but will result in the incidental take of the species, the USFWS must provide an

23    "Incidental Take Statement" ("ITS") to the action agency. 16 U.S.C. § 1536(b)(4); 50 C.F.R.

24

AMENDED COMPLAINT                                                                              30

1    § 402.14(i)(1). The ITS must specify the impact (amount and extent) of such incidental

2    taking on the species and specify the reasonable and prudent measures USFWS considers

3    necessary or appropriate to minimize such impact. 50 C.F.R. § 402.14(i)(1).  Further, the ITS

4    must set forth terms and conditions to implement the reasonable and prudent measures. *Id.*

5    144.    The USFWS's "take" analysis failed to find a taking of the Northern

6    Spotted Owl by "harm" (*i.e.* habitat destruction) in addition to a taking via harassment, even

7    though the record makes it abundantly clear that "harm" will occur and that identified pairs of

8    Owls will be killed.

9    145.    The ITS fails to clearly articulate the amount or extent of the anticipated

10    incidental taking or the impact of this level of take on the species at the local CHU or Subunit

11    level. The ITS also fails to specify reasonable and prudent measures necessary or appropriate

12    to minimize the anticipated take and fails to set forth terms and conditions to enforce any

13    reasonable and prudent measures.

14    146.    Accordingly, for the reasons stated above, the ITS issued by the USFWS

15    to the USFS to allow it to take Northern Spotted Owls, is arbitrary, capricious, an abuse of

16    discretion, and otherwise not in accordance with the ESA and its implementing regulations or

17    the procedures required by law in violation of the APA. 5 U.S.C. § 706(2)(A) & (D).

18    147.    Plaintiffs are entitled to its reasonable fees, costs, and expenses associated

19    with this litigation pursuant to the ESA, 16 U.S.C. § 1540(g) and/or Equal Access to Justice

20    Act, 28 U.S.C. § 2412.

21                              **CLAIM V**

22                              **(USFS)**

23                    **Violation of NFMA and the APA**

24

1        **Failure to Satisfy Forest Plan Standard for Snags/Down Logs**

2        148.      Plaintiffs incorporate by reference all preceding paragraphs.

3        149.      NFMA mandates that the USFS' activities carried out on the National

4    Forests "shall be consistent with land management plans."  16 U.S.C. § 1604(I); 36 C.F.R. §

5    219.10(e).

6        150.      The STNF LRMP, including its incorporation of the Northwest Forest

7    Plan (NWFP) Record of Decision, is a "land management plan."

8        151.      The STNF LRMP requires snags and down logs in Late-Successional

9    Reserves be maintained at naturally occurring levels or two to six snags per acre and four to

10   six down logs per acre.  LRMP 4-38.  This standard will not be met in the fuel management

11   zones that cover 1,846 acres and range from 150 to 1,200 feet from the road edge.

12       152.      Defendant's actions as described above are arbitrary, capricious, not in

13   accordance with law, and without observance of procedures required by law, within the

14   meaning of the APA, 5 U.S.C. § 706.

15       153.      Plaintiffs are entitled to its reasonable fees, costs, and expenses associated

16   with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

17                              **CLAIM VI**

18                               **(USFS)**

19                    **Violation of NFMA and the APA**

20            **Violation of Old-Growth Retention Standard**

21       154.      Plaintiffs incorporate by reference all preceding paragraphs.

22

23

24

AMENDED COMPLAINT                                                              32

1    155.    NFMA mandates that the USFS' activities carried out on the National

2    Forests "shall be consistent with land management plans."  16 U.S.C. § 1604(I); 36 C.F.R. §

3    219.10(e).

4    156.    The STNF LRMP, including its incorporation of the Northwest Forest

5    Plan (NWFP) Record of Decision, is a "land management plan."

6    157.    The project area is located within the area managed under the direction of

7    the Northwest Forest Plan.  The Northwest Forest Plan is designed around the conservation

8    needs of the Spotted Owl and other "Old Growth" associated species.  The Northwest Forest

9    Plan was based on the designation of a variety of land use allocations whose objectives are

10   either to provide for Spotted Owl population clusters or to maintain connectivity between

11   population clusters.  Several land use allocations are intended to contribute primarily to

12   supporting population clusters, including Late-Successional Reserves and Managed Late-

13   Successional Reserves.

14   158.    The Northwest Forest Plan requires the "[r]etention of old growth

15   fragments where little remains," and acknowledges that older, denser conifer stands typically

16   provide better habitat conditions for species associated with old growth forests such as the

17   Spotted Owl.  Spotted Owl habitat quality improves with age and canopy cover.

18   159.    The District Biologist made several recommendations regarding this

19   standard, which the USFS ignored without explanation.

20   160.    The USFS failed to indicate what quantity of Old Growth would exist in

21   any of the three watersheds within the Pettijohn Project after the Project is finished.

22   161.    The USFS calculated all late-successional habitat to meet the 15%

23   standard rather than the Old Growth component of late-successional habitat.

24

AMENDED COMPLAINT                                                                          33

1    162.    The Peittijohn Project is dominated by mature (80 to 100-year old) mixed

2    conifer stands.  The Northwest Forest Plan does not permit logging of trees over 80 years old

3    in a Late-Successional Reserve.

4    163.    According to the Late-Successional Reserve Assessment, the criteria for

5    selecting treatment areas states that:

6    "Within stands of the LSR that are generally lacking in late-successional habitat, those
     stands that would respond to treatment by accelerated development into late-successional
7    habitat.  Younger stands are generally more responsive to treatment, and should be
     considered higher priority than older mid-successional stands, relative to this objective."

8
9    164.    Defendant's actions as described above are arbitrary, capricious, not in

10   accordance with law, and without observance of procedures required by law, within the

11   meaning of the APA, 5 U.S.C. § 706.

12   165.    Plaintiffs are entitled to its reasonable fees, costs, and expenses associated

13   with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

14                                    **CLAIM VII**

15                                      **(USFS)**

16                            **Violation of NEPA and the APA**

17   **Failure to Take a Hard Look at the Project's Direct, Indirect, and Cumulative Impacts**

18   166.    Plaintiffs incorporate by reference all preceding paragraphs.

19   167.    NEPA requires federal agencies to analyze the foreseeable environmental

20   impacts, including direct, indirect, and cumulative impacts of major federal actions.  42

21   U.S.C. § 4332(c)(I); 40 C.F.R. § 1508.7.

22   168.    NEPA requires the analysis and consideration of cumulative effects which

23   result from the incremental impact of the action when added to other past, present, and

24   reasonably foreseeable future actions.  40 C.F.R. § 1508.25(a).

AMENDED COMPLAINT                                                          34

1    169.    A federal timber sale is a major federal action as defined by NEPA.

2    170.    The Pettijohn project is one of many timber sales on the STNF in Spotted

3   Owl critical habitat and within a LSR.  The USFS has separately analyzed and/or approved

4   many projects that also involve Spotted Owl habitat, including the Algoma, Big Mtn.,

5   Brown's Deer Creek, Eagle Ranch, East Fork, Edson, Gemmill, Harris, Miners Salvage,

6   Moosehead, Mudflow, Pilgrim, Porcupine, Powder, Rattlesnake, Trough and Trout Creek

7   projects.  These projects combined total hundreds of millions of board feet of timber

8   impacting designated Owl critical habitat.

9    171.    The Record of Decision for the Pettijohn Project violates NEPA because it

10   fails to adequately analyze and disclose the direct, indirect, and cumulative effects of the

11   Project in several respects including, without limitation, as described below.

12    172.    *Inadequate Analysis of the No-Action Alternative.*  The USFS failed to

13   adequately analyze the no-action alternative.  The USFS failed to adequately consider an

14   analyze the actual impacts of the no-action alterative that is required by NEPA, including the

15   benefits that alternative would provide to the Spotted Owl when compared to the action

16   alternative.

17    173.    *Environmental Baseline.* The USFS failed to take a hard look at the

18   environmental baseline for the Pettijohn Project, which resulted in a skewed and inaccurate

19   effects analysis.

20    174.    *Cumulative impacts.*  The USFS failed to take a hard look at or adequately

21   analyze the cumulative effect of past, present, and known upcoming projects on the Spotted

22   Owl and Spotted Owl critical habitat.  The information contained in the FEIS is contradictory

23   as it relates to cumulative effects and the tables in Attachment 5 (including Table A5-2, A5-

24

AMENDED COMPLAINT                                                                      35

1    3, A5-4, and A5-6) fail to analyze or document the cumulative effects of the on Spotted Owl

2    critical habitat.  The cumulative actions table in Appendix E also fails to analyze the

3    cumulative effects of the Pettijohn Project in relation to other projects.

4          175.    *Impacts to Spotted Owl.*  The USFS failed to adequately analyze impacts

5    of the Project to the Spotted Owl, including but not limited to the impacts to the Spotted Owl

6    from Project noise, reduction in prey species, territorial Barred owls, beneficial impacts to

7    the Spotted Owl under the no-action alternative, the impacts from high-severity wildfire, and

8    removal of large trees,

9          176.    *Inadequate Information.* The USFS has not gathered adequate information

10    about how the health and status of the Spotted Owl within the Project area which skews the

11    environmental baseline for determination of the effects analysis.  The USFS also

12    acknowledged that it does not have high value habitat within the Spotted Owl's core areas,

13    and only proposes to gather and designate this information in the field, after the NEPA

14    analysis has concluded.

15          177.    *Old Growth/Large Tree Removal.* The USFS failed to take a hard look at

16    the effect of removing old growth and large trees that provide habitat for the Spotted Owl.

17          178.    *Inaccurate Analysis of the Project Impacts.*  The USFS failed to take a

18    hard look at impacts of the Project on the Owl and its critical habitat by inaccurately

19    calculating or representing such impacts in the FEIS, 2017 WSIR and ROD including,

20    without limitation the summary of impacts to the Pettijohn Project Action Area contained in

21    Table 1 of the 2017 WSIR.

22

23

24

AMENDED COMPLAINT                                                   36

1    179.    *Wildland Urban Interface.*  The USFS failed to take a hard look at and

2    unlawfully designated the entirety of the Pettijohn Project treatment area as "Wildland Urban

3    Interface," requiring heightened fire prevention.

4    180.    *Wildfire.*  A major premise for the Pettijohn Project is to protect the LSR

5    from a "catastrophic" wildfire.  The USFS, however, failed to take a hard look at the

6    likelihood of a "catastrophic" wildfire within the Project area, to consider the benefits of

7    wildfire to the habitat, the direction in its own LSR Assessment regarding wildfire in LSR

8    habitat, and ignored scientific evidence that Owls use burned forest as habitat.

9    181.    The USFS ignored valid scientific evidence undermining its assumptions

10   about wildfire, including the value of retaining larger trees to lessen fire severity.

11   182.    The USFS overstated fire risk while understating the adverse

12   consequences of active management.  The USFS improperly applied a worst-case scenario of

13   climate and fuels in its modeling program, unjustly portraying the fuel management zone

14   areas and risks.

15   183.    The USFS unreasonably anticipates that treatments in thinning areas will

16   be effective for 50 years.  This assumption is contrary to the well-accepted research that

17   shows thinning is generally effective for only 10 to 20 years.  This will result in further

18   disturbance of the habitat in 10 to 20 years to maintain any benefit from reduction of wildfire

19   from the Project.

20   184.    The piling of fuels presents increased fire risk to the Project area for years

21   into the future but this post-Project fire risk is not incorporated into the fire risk models used

22   to justify the action alternative.

23

24

AMENDED COMPLAINT                                                                    37

1    185.    The USFS failed to address the effect of the location of the Project –

2    bordered by water bodies and a road – when arguing in favor of fire containment.

3    186.    The USFS failed to address that the "best available science" for Northern

4    California documents that fire risk is greatest in small diameter trees, not old, large trees or

5    Old Growth forest.

6    187.    *Removal of Old Growth and Closed Canopy.*  The USFS failed to take a

7    hard look at the Project's impacts associated with the removal of Old Growth and closed

8    canopy structure. The USFS acknowledges it lacks on-the-ground information about canopy

9    structure, but the USFS proposes thinning in closed-canopy units, which is not justified under

10   the agency's own studies and rationale.  The District Biologist made several

11   recommendations to analyze the ecological role of particular stands as it relates to Old

12   Growth habitat, consider silvicultural treatments in younger stands, and avoid harvesting in

13   particular old growth stands. These recommendations were ignored by the USFS.

14   188.    The USFS has not demonstrated that the Project will satisfy the NWFP

15   standard of retaining 15% of Old Growth, maintain the values for Old Growth in treated

16   areas, and has not adequately analyzed impacts of treatments to Old Growth and the species

17   that rely upon Old-Growth forests.

18   189.    The HFRA allows Old Growth logging in a project if the project will

19   "fully maintain, or contribute toward the restoration of, the structure and composition of old

20   growth stands according to the pre-fire suppression old growth conditions characteristic of

21   the forest type, taking into account the contribution of the stand to landscape fire adaptation

22   and watershed health, and retaining large trees contributing to old growth structure."  16

23   U.SC. § 6512(e)(2).

24

AMENDED COMPLAINT                                                                38

190.     The Pettijohn Project Biological Assessment acknowledges that prior to USFS suppression efforts, the Project area was largely composed of Old Growth forest.

191.     The HFRA also contains a requirement to protect "large" trees:

"Except in old growth stands where the management direction is consistent with subsection (e)(2), the Secretary shall carry out a covered project in a manner that – (A) focuses largely on small diameter trees, thinning, strategic fuel breaks, and prescribed fire to modify fire behavior, as measured by the projected reduction of uncharacteristically severe wildfire effects for the forest type (sch as adverse soil impacts, tree mortality or other impacts); and (B) maximizes the retention of large trees, as appropriate for the forest type, to the extent that the trees promote fire-resilient stands."

16 U.S.C. § 6512(f).

192.     The USFS failed to substantively analyze whether the Project will satisfy the HFRA requirements above.

193.     *Removal of Snags*.  The USFS failed to take a hard look at the effect to the Spotted Owl of removal of snags throughout the project and the FMZ.

194.     *Greenhouse Gases.* The USFS failed to take a hard look at the carbon effects and balance of the Project including, without limitation, at the effects of the Project resulting in the release of soils carbon, at the effects of the Project on Old Growth stands as climate refugia and carbon storage and their ability to sequester significant amounts of atmospheric carbon, the release of carbon from the creation and use of wood products from logged timber from the Project, the release of carbon from burning as part of the Project activities, and the unsupported assumption that a wildfire in the Project area would result in greater carbon release that the carbon effects of the Project activities.  The USFS further failed to take a hard look at the effect and influence of climate change on Project, as well as the effect and influence of the Project on the climate.

AMENDED COMPLAINT                                                                                    39

1    195.    Defendant's actions as described above are arbitrary, capricious, not in

2    accordance with law, and without observance of procedures required by law, within the

3    meaning of the APA, 5 U.S.C. § 706.

4    196.    Plaintiffs are entitled to its reasonable fees, costs, and expenses associated

5    with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

6    **CLAIM VIII**

7    **(USFS)**

8    **Violation of HFRA and the APA**

9    **Failure to Maintain or Restore Old Growth Forests**

10    197.    Plaintiffs incorporate by reference all preceding paragraphs.

11    198.    Section 102(e)(2) of the HFRA requires that:

12

13    "In carrying out a covered project, the Secretary shall fully maintain, or contribute
      toward the restoration of, the structure and composition of old growth stands
      according to the pre-fire suppression old growth conditions characteristic of the forest
14    type, taking into account the contribution of the stand to landscape fire adaptation and
      watershed health, and retaining large trees contributing to old growth structure." 16
15    U.S.C. § 6512(e)(2).

16    199.    The Healthy Forests Initiative and HFRA Interim Field Guide, on page 7,

17    states that the legislation "[r]equires HFRA projects on NFS land maximize retention of

18    larger trees in areas other than old-growth stands, consistent with the objectives of restoring

19    fire-resilient stands and protecting at-risk communities and federal lands."

20    200.    The Pettijohn Project would degrade and remove larger trees and old-

21    growth habitat characteristics and structure from these forest stands, contrary to the above

22    requirements.

23

24

AMENDED COMPLAINT                                                                    40

1    201.    Defendant's actions as described above are arbitrary, capricious, not in

2    accordance with law, and without observance of procedures required by law, within the

3    meaning of the APA, 5 U.S.C. § 706(1) and (2)(A).

4    202.    Plaintiffs are entitled to its reasonable fees, costs, and expenses associated

5    with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

6                                    **CLAIM IX**

7                                     **(USFS)**

8                         **Violation of NEPA and the APA**

9    **Failure to Prepare Supplemental NEPA Analysis Based Upon Significant**
10                  **New Information or Circumstances**

11   203.    Plaintiffs incorporate by reference all preceding paragraphs.

12   204.    New circumstances and information that come to light after the agency's

13   decision require the agency to issue supplemental NEPA analysis in an EA or an EIS under

14   the CEQ regulations if this information is relevant to environmental concerns and bears on

15   the proposed action or its impacts.  *See* 40 C.F.R. § 1502.9(c)(1)(ii)).

16   205.    Federal agencies have a continuing duty to gather and evaluate new

17   information relevant to the environmental impact of its actions.  An agency must re-examine

18   its decision when an EIS rests on stale scientific evidence and false assumptions.

19   206.    Federal agencies must take a "hard look" at any new information to

20   determine whether supplemental NEPA analysis is required.

21   207.    Despite the fact that the information underlying the Pettijohn Project FEIS

22   is more than 7 years old, the USFS failed to perform supplemental NEPA analysis.

23   208.    Supplemental NEPA analysis is necessary to assess the baseline after more

24   than 7 years have passed.  For example, the 2018 Baseline Adjustment prepared by the

AMENDED COMPLAINT                                                        41

1    USFWS in cooperation with the USFS to update the baseline for the Spotted Owl.  The 2018

2    Baseline Adjustment provides significant new information on the impacts of wildfires from

3    2010-2018 on Spotted Owl habitat in the STNF and three other national forests in northern

4    California.

5          209.      The 2018 Baseline Adjustment creates an interim baseline that underpins

6    the USFWS' current estimate of suitable Spotted Owl habitat.  The 2018 Baseline

7    Adjustment provides a critical habitat baseline adjustment that "utilizes the best available

8    information to date to describe the change in and current habitat conditions for the Owl from

9    wildfires within the California Klamath, California Cascades, and California Coast

10   physiographic provinces, allowing the [Yreka Fish and Wildlife Service Office] . . . to better

11   assess the status of the species and its critical habitat." The 2018 Baseline Adjustment states

12   that between 2007 and 2018 the four National Forests lost a combined 97,364 acres, or 4%,

13   of their Northern Spotted Owl suitable habitat, and the STNF experienced a loss of 7% of its

14   Northern Spotted Owl suitable habitat.  The 2018 Baseline Adjustment states that between

15   2010 and 2018 wildfires reduced the Nesting/Roosting habitat in CH Unit 11 by -42.2%,

16   Foraging habitat was reduced by -22.2% and Dispersal habitat by -31.4%. In CH Subunit

17   ICC 7, between 2012 and 2018 wildfires reduced Nesting/Roosting habitat by -4,522 acres,

18   Foraging habitat by -70 acres, and Dispersal habitat by -1,476 acres.

19         210.      The new information provided by the 2018 Baseline Adjustment

20   significantly effects the environmental baseline used in the 2017 WSIR and the 2018 SBO by

21   changing the baseline acreages of suitable Owl habitat and Critical Habitat rangewide as well

22   as for the California Klamath Physiographic Province, Critical Habitat Unit 11 and Subunit

23

24

AMENDED COMPLAINT                                                                          42

1    ICC-7, which in turn under-estimates the effects of the Pettijohn Projects on Critical Habitat

2    at the rangewide, province, CHU and subunit scales.

3        211.    The Forest Service's decision not to prepare supplemental NEPA analysis

4    in light of the finalization of the 2012 Critical Habitat Rule, as indicated in the USFS' 2019

5    SIR, was arbitrary and caprcious.

6        212.    The Forest Service's decision not to prepare supplemental NEPA analysis

7    for the gray wolf (*Canis lupus*) in light of its discovery in California, as well as the Shasta

8    Pack, as indicated in the 2019 SIR, was arbitrary and capricious.

9        213.    The Forest Service's decision not to prepare supplemental NEPA analysis

10   in light of increased barred owl populations within the Pettijohn Project's action area, as

11   indicated in the 2019 SIR, was arbitrary and capricious because barred owls have concededly

12   impacted nesting and roosting of the already-declining Spotted Owl.

13       214.    The Forest Service's decision not to prepare supplemental NEPA analysis

14   in light of Northern Spotted Owl nest movements and new activity centers, as indicated in

15   2019 SIR, was arbitrary and capricious.  Of the four original activity centers

16       215.    Defendant's actions as described above are arbitrary, capricious, not in

17   accordance with law, and without observance of procedures required by law, within the

18   meaning of the APA, 5 U.S.C. § 706.

19       216.    Plaintiffs are entitled to its reasonable fees, costs, and expenses associated

20   with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

21                              **CLAIM X**

22                              **(USFS)**

23                    **Violation of NFMA and the APA**

24

AMENDED COMPLAINT                                                    43

1          **The Pettijohn Project is Not Consistent with the 2012 Revised Recovery Plan**

2          217.          Plaintiffs incorporate by reference all preceding paragraphs.

3          218.          Standard and Guideline 25(h) of the STNF LRMP requires consistency

4    with an individual species' recovery plan, such as the 2011 Recovery Plan, in any action to

5    maintain and/or enhance habitat for threatened and endangered species.

6          219.          Defendant USFS has violated NFMA by failing to fully consider, apply or

7    be consistent with the guidance for recovery of the Owl contained in the 2011 Recovery Plan

8    including, without limitation, consistency with Recovery Actions 10 and 32.

9          220.          Defendant's actions as described above are arbitrary, capricious, not in

10   accordance with law, and without observance of procedures required by law, within the

11   meaning of the APA, 5 U.S.C. § 706.

12         221.          Plaintiffs are entitled to its reasonable fees, costs, and expenses associated

13   with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

14                    **PLAINTIFF'S PRAYER FOR RELIEF**

15
16         222.          WHEREFORE, Plaintiff respectfully requests that this Court enter a

17   judgment in favor of Plaintiff and issue the following relief:

18         •   declare that Defendant USFS violated NEPA;

19         •   declare that Defendant USFS violated NFMA;

20         •   declare that Defendant USFS violated the ESA;

21         •   declare that Defendant USFS violated the APA;

22         •   declare that Defendant USFWS violated the ESA;

23         •   declare that Defendant USFWS violated the APA;

24

AMENDED COMPLAINT                                                           44

1
- declare that Defendants actions as set forth in this complaint are arbitrary,
2
  capricious, an abuse of discretion, are not in accordance with law and are without
3
  observance of procedures required by law and therefore must be set aside
4
  pursuant to the APA, 5 U.S.C. § 706(2);
5
- vacate and remand the FEIS and Record of Decision;
6
- vacate and remand the Supplemental Biological Opinion;
7
- enjoin Defendant USFS from implementing the Pettijohn Project until Defendant
8
  has complied with NEPA, NFMA, ESA, and the APA;
9
- award Plaintiff its reasonable attorney fees, costs, and expenses associated with
10
  this litigation pursuant to the ESA 16 U.S.C. § 1540(g) and/or the Equal Access to
11
  Justice Act, 28 U.S.C. § 2412 or other authority;
12
- and grant Plaintiff such additional and further relief as the Court deems just and
13
  equitable.
14
Respectfully submitted this 30th day of September 2019,
15
                                   /s/ Andrew G. Ogden
16
                                  ANDREW G. OGDEN
17
                                   /s/ Sean T. Malone
                                  SEAN T. MALONE
18
                                  Attorneys for Plaintiffs
19

20

21

22

23

24

AMENDED COMPLAINT                                                              45

1

## CERTIFICATE OF SERVICE

2        I hereby certify that on September 30, 2019, I electronically filed the foregoing document

3 with the Clerk of Court using the CM/ECF system, which will send a notification of this filing to

4 the attorneys of record.

5                                     /s/Sean T. Malone

                                      SEAN T. MALONE

6                                       Attorney at Law

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

AMENDED COMPLAINT                                                                  46