1

2

3

4

5

6

7

8

9                     UNITED STATES DISTRICT COURT

10                    EASTERN DISTRICT OF CALIFORNIA

11

12   CONSERVATION CONGRESS and          No.  2:13-cv-00934-JAM-DB
     CITIZENS FOR BETTER FORESTRY,
13
              Plaintiffs,
14                                       **ORDER DENYING PLAINTIFFS' MOTION
          v.                             TO SUPPLEMENT THE ADMINISTRATIVE
15                                       RECORD; DENYING PLAINTIFFS'
     UNITED STATES FOREST SERVICE        MOTION TO STRIKE; DENYING
16   and UNITED STATES FISH AND          PLAINTIFFS' MOTION FOR SUMMARY
     WILDLIFE SERVICE,                   JUDGMENT; AND GRANTING DEFENDANT
17                                       AND DEFENDANT-INTERVENOR'S
              Defendants,                MOTIONS FOR SUMMARY JUDGMENT**
18
     AMERICAN FOREST RESOURCE
19   COUNCIL,

20            Defendant-
              Intervenor.
21

22       For nearly a decade, the parties have argued over the impact

23   the Pettijohn Project would have on the Shasta-Trinity National

24   Forest's Northern Spotted Owl ("spotted owl") population and its

25   wildfire management efforts.  Conservation Congress and the

26   Citizens for Better Forestry (collectively, "Plaintiffs") believe

27   the project will destroy critical old-growth forest that the

28   spotted owls need to survive.  The United States Forest Service

                              1

("the Forest Service"), the United States Fish and Wildlife Service ("Fish and Wildlife"), and the American Forest Resource Council ("the Resource Council") contend the project will reduce the likelihood of major wildfires and will have minimal short-term effects on the spotted owls and their critical habitat.

This dispute has finally come to a head with the filing of cross-motions for summary judgment by all parties involved. See Pls.' Mot. Summ. J., ECF No. 62; Defs.' Mot. Summ. J., ECF No. 73; Def-Interv.'s Mot. Summ. J., ECF No. 76. In addition, Plaintiffs have filed a motion to supplement the administrative record, see Mot. to Supp. Admin. Record, ECF No. 66-1, and a motion to strike, see Mot. to Strike, ECF No. 79. For the reasons set forth below, the Court DENIES Plaintiffs' motion to supplement the administrative record; DENIES Plaintiffs' motion to strike; DENIES Plaintiffs' motion for summary judgment; GRANTS the Forest Service and Fish and Wildlife's motion for summary judgment; and GRANTS the Resource Council's motion for summary judgment.[1]

I.   STATUTORY, FACTUAL, AND PROCEDURAL BACKGROUND

A.   The National Environmental Policy Act

The National Environmental Policy Act ("NEPA") "is a procedural statute that requires the federal government to carefully consider the impacts of and alternatives to major environmental decisions." Native Ecosystems Council v. Weldon,

---

[1] These motions were determined to be suitable for decision without oral argument. E.D. Cal. L.R. 230(g). The hearing was scheduled for January 12, 2021.

697 F.3d 1043, 1051–52 (9th Cir. 2012) (citing 42 U.S.C. §§ 4321, 4331).  NEPA requires that federal agencies take a "hard look" at the environmental consequences of their proposed actions and then inform the public about the agency's decision-making process.  Kern v. U.S. Bureau of Land Mgmt., 284 F.3d 1062, 1066 (9th Cir. 2002).  "NEPA is concerned with process alone and merely prohibits uninformed—rather than unwise—agency action."  Turtle Island Restoration Network v. U.S. Dep't of Commerce, 878 F.3d 725, 730 (9th Cir. 2017) (internal quotation marks and citation omitted).  Judicial review of agency decision-making is "at its most deferential" when reviewing scientific judgments and technical analyses within the agency's expertise.  N. Plains Res. Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1075 (9th Cir. 2011).

B.   The National Forest Management Act

The National Forest Management Act ("the NFMA") "charges the Forest Service with the management of national forest land, including planning for the protection and use of the land and its natural resources."  All. for the Wild Rockies v. U.S. Forest Serv., 907 F.3d 1105, 1109 (9th Cir. 2018).  The Forest Service develops land and resource management plans ("forest plans"), 16 U.S.C. § 1604, that summarize the "broad, long-term plans and objectives for the entire forest."  Weldon, 697 F.3d at 1056.  Forest plans include guidelines to help achieve the NFMA's goals, including consideration of both economic and environmental concerns, preservation of diversity in plant and animal communities, and research on the effects of forest management.  16 U.S.C. § 1604(g)(3).

"After a forest plan is approved, the Forest Service implements the forest plan when approving or denying site-specific projects." Weldon, 697 F.3d at 1056. Courts must defer to the Forest Service's reasonable interpretation of its own guidelines, overturning the agency's decision only if it is plainly erroneous or inconsistent with the forest plan. Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089, 1098 (9th Cir. 2003). "A project is consistent if it conforms to the applicable 'components' of the forest plan, including the standards, guidelines, and desired conditions that are set forth in the forest plan and that collectively establish the details of forest management." All. for the Wild Rockies, 907 F.3d at 1109–10. Although a forest plan's "standards" require strict adherence, the Forest Service may deviate from the plan's "guidelines" if the agency documents the rationale for the deviation. Id.

C.   The Healthy Forest Restoration Act

The Healthy Forest Restoration Act ("HFRA") aims to reduce "wildfire risk to communities, municipal water supplies, and other at-risk Federal land," address "threats to forest and rangeland health, including catastrophic wildfire," and protect, restore, and enhance forest ecosystem components "to promote the recovery of threatened and endangered species." 16 U.S.C. § 6501(1), (3), (6). To achieve these goals, HFRA provides for the implementation of "authorized hazardous fuel reduction projects" on federal land that contains habitat for threatened and endangered species where the project "will provide enhanced protection from catastrophic wildfire" for species or its habitat. 16 U.S.C. § 6512(a)(5)(B).

D.   The Endangered Species Act

The Endangered Species Act ("the ESA") "reflects a conscious decision by Congress to give endangered species priority over the primary missions of federal agencies." W. Watersheds Project v. Kraayenbrink, 632 F.3d 472, 495 (9th Cir. 2011) (internal quotations marks and citation omitted). The ESA tasks federal agencies with ensuring that any "agency action" is not likely to jeopardize the continued existence of any listed species.  16 U.S.C. § 1536(a)(2).  Further, agency action may not destroy or adversely modify the critical habitat of any listed species.  Id.

Agency actions that "may affect" a listed species require the acting agency to formally consult with the federal agency responsible for protecting that species.  50 C.F.R. § 402.14(a); Grand Canyon Tr. v. U.S. Bureau of Reclamation, 691 F.3d 1008, 1011–12 (9th Cir. 2012), as amended (Sept. 17, 2012).  If a listed species is present in the area of a proposed action, the acting agency—here, the Forest Service—must conduct a Biological Assessment ("BA"), "for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action."  16 U.S.C. § 1536(c).

At the end of the formal consultation process, the Secretary of the consulting agency—here, Fish and Wildlife—must issue a Biological Opinion ("BiOp").  Id. § 1536(b)(3)(A).  A BiOp is a "written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat."  Id.  If the consulting agency believes that

the project will jeopardize a listed species or adversely modify

the species' habitat, "the Secretary shall suggest those

reasonable and prudent alternatives which he believes would not

violate subsection (a)(2) and can be taken by the Federal agency

or applicant in implementing the agency action." Id. If the

acting agency subsequently modifies the action "in a manner that

causes an effect to the listed species or critical habitat that

was not considered in the [BiOp]," the agencies must reinitiate

formal consultation. 50 C.F.R. § 402.16.

    E.   The Shasta-Trinity National Forest and Clear Creek

        Late Successional Reserve

    The Shasta-Trinity National Forest is a 2.1-million-acre

mixed conifer forest located in northern California. FS-AR

005320. The forest provides habitat for certain species listed

as threatened or endangered under the ESA. FS-AR 004809-12. The

spotted owl was listed as threatened in 1990. FS-AR 004811-12;

55 Fed. Reg. 26,194 (June 26, 1990). Pursuant to the Northwest

Forest Plan ("NWFP"), portions of the forest are classified as

Late Successional Reserves ("LSR"). FS-AR 003240; FS-AR 005852.

LSRs are intended to "maintain a functional, interactive, late-

successional and old-growth forest ecosystem" that "serve[s] as

habitat for late-successional and old-growth related species

including the [spotted owl]." FS-AR 005856. Programmed timber

harvesting is prohibited in LSRs, however, the NWFP allows for

"thinning or other silvicultural treatments . . . to reduce risks

of large-scale disturbance" in LSRs "east of the Cascades and in

Oregon and California Klamath Provinces." FS-AR 005858.

    The Clear Creek LSR is in the Shasta-Trinity National Forest

and consists of approximately 84,000 acres primarily in the Klamath Province, 35,000 acres of which are privately owned and managed for timber production. FS-AR 003570; FS-AR 003206; FS-AR 003193; FS-AR 001954. A 1997 assessment of the Clear Creek LSR concluded that decades of fire suppression and logging "shifted the fire regime within the area [] and increased the potential for partial to complete stand-replacing[2] fires within mature conifer and hardwood stands." FS-AR 003573. As a result, the assessment recommended prioritizing activities that would thin overstocked young to mature conifer stands in the LSR. See FS-AR 003595-601. The thinning treatment would reduce the risk of large-scale losses of dense young to mature stands, and adjacent older stands, from stand-replacing crown fires by thinning out the vegetation below them. FS-AR 003597. It would also enhance late successional and old-growth stand development by "concentrating growth on fewer individual trees to provide larger conifers with larger fuller crowns." Id.

     F.    The Pettijohn Late Successional Reserve Habitat Improvement and Fuels Reduction Project

In December 2008, the Forest Service initiated NEPA's scoping process by publishing a notice of intent to prepare an environmental impact statement ("EIS") for a proposed action in the Pettijohn area of the Clear Creek LSR under HFRA. See FS-AR 001671. The Forest Service's proposed action for the Pettijohn area would thin mature stands to reduce the risk of stand-

---

[2] A stand-replacing fire is a fire which kills all or most of the living overstory trees in a forest and initiates forest succession or regrowth. See https://www.nwcg.gov/term/glossary/stand-replacing-fire.

replacing wildfire, foster late-successional and old-growth

conditions, and promote fire suppression activities.  Id.  The

action contemplates thinning from below on 1,155 acres of overly

dense conifer stands.  FS-AR 001672.  Thinning from below is a

silvicultural technique in which a desired stand density is

identified, and the stand is thinned by removing the smallest

and least healthy trees, while retaining the largest and

healthiest ones, until the desired density is achieved.  Id.

The action also provides for the creation of fuel management

zones ("FMZs") on 1,995 acres.  Id.  FMZs are roadside areas

where fuels are reduced, and hazard trees are removed.  Id.

    After receiving public comment on a draft EIS assessing the

potential environmental effects of the proposed action, the

Forest Service published a final EIS ("FEIS") in May 2012.  See

FS-AR 000891-1350 (draft EIS); FS-AR 000343-890 (FEIS).  The

FEIS analyzed the potential environmental effects of the

proposed action, including potential effects on fire and fuels,

wildlife, silviculture, air quality, and climate change.  See

FS-AR 000401-18 (fire and fuels); FS-AR 000418-45 (wildlife);

FS-AR 000445-56 (silviculture); FS-AR 000523-30 (air quality);

FS-AR 000543 (climate change).  After an objection period, the

Forest Service approved the Pettijohn Late Successional Reserve

Habitat Improvement and Fuels Reduction Project ("the Pettijohn

Project") with a record of decision ("ROD") in March 2013.  FS-

AR 000307-330.

    The Pettijohn Project area encompasses 13,162 acres of

federal land and 8,409 acres of private land.  FS-AR 000311.

The area also includes 14,347 acres of spotted owl critical

habitat.  FS-AR 022777.  Contained within the critical habitat

is 11,103 acres of nesting, roosting, and foraging habitat of

which 3,518 acres are old-growth, high-quality nesting and

roosting habitat and 7,858 acres are mature, moderate-quality

nesting and roosting habitat.  FS-AR 000422.  Under the ROD, the

Pettijohn Project will thin 958 acres of overly dense conifer

stands and create 1,846 acres of FMZs along thirty-six miles of

road.  FS-AR 00313.  Appendix H of the FEIS details the thinning

prescriptions designed by an interdisciplinary team to "maintain

the densest canopy [] sustainable with late summer fire events

while maintaining large/old trees, large snags/logs[,] and

viable understory hardwoods."  FS-AR 000791.  The project also

provides for prescribed burning on 101 acres; hand thinning,

piling, and burning on eleven acres; decommissioning 2.3 miles

of road; creating thirty-six short-term cut timber landings; and

construction of 0.95 miles of temporary roads to access the

landings.  FS-AR 000313-14.

Before approving the Pettijohn Project, the Forest Service

formally consulted with Fish and Wildlife under Section 7 of the

ESA.  See FS-AR 002092-93.  As part of that process, the Forest

Service transmitted an April 2011 BA and 2012 BA supplement to

Fish and Wildlife.  See FS-AR 002705-820; FS-AR 002672-99.  The

BA determined that the project is likely to adversely affect the

spotted owl and its designated critical habitat by reducing some

of its quality.  FS-AR 002754-55.  It also found that the

project is likely to benefit the spotted owls by "reducing the

risk and hazard of catastrophic loss of suitable habitat to

late-season wildfire."  Id.  Fish and Wildlife's resulting May

2012 BiOp assessed the potential effects of the Pettijohn
Project on the spotted owl and its critical habitat, finding the
project was not likely to jeopardize the continued existence of
the spotted owl or adversely modify its critical habitat.  FS-AR
001996-97.

In June 2013, the Forest Service reinitiated consultation
with Fish and Wildlife due to revisions of the spotted owl's
critical habitat and the presence of barred owls in the project
area.  See FS-AR 022790.  In June 2017, the Forest Service
transmitted a supplemental information report to Fish and
Wildlife that addressed: barred owls, changes to spotted owl
occupancy and activity centers in the project area, the 2012
Critical Habitat Rule, the 2011 Revised Recovery Plan, and the
spotted owl's use of burned habitat.  FS-AR 022790-850.  In
response, Fish and Wildlife issued a supplemental BiOp in April
2018, concluding the project would not jeopardize the existence
of the spotted owl or adversely modify its critical habitat.
FS-AR 022942.

In March 2019, the Forest Service prepared a supplemental
information report ("SIR"), explaining that the information in
the BA supplement and BiOp supplement did not constitute
significant new information warranting a supplemental EIS under
NEPA.  FS-AR 022774-85.  The SIR also explained that the
Pettijohn Project's total treatments would be reduced by an
additional 121 acres in light of spotted owl movement and new
activity centers.  FS-AR 022785-86.  The project will, instead,
thin from below 908 acres and create FMZs on 1,775 acres.  FS-AR
022786.

G. Procedural Posture

Plaintiffs filed suit in May 2013, challenging the Pettijohn Project under the ESA, the NFMA, NEPA, HFRA, and the Administrative Procedures Act ("the APA"). See Compl. ¶¶ 2, 10, ECF No. 1. The parties stipulated to stay the proceedings after the Forest Service requested additional consultation with Fish and Wildlife. See ECF Nos. 11, 13. Six years later, the Forest Service issued the SIR modifying the project. First Am. Compl. ("FAC") ¶ 60, ECF No. 32. In response, Plaintiffs filed an amended complaint, alleging the project sill violates the ESA, the NFMA, NEPA, HFRA, and the APA. See FAC.

On February 10, 2020, Plaintiffs filed a motion to supplement the administrative record. See ECF No. 38. The Court granted it in part and denied it in part. See Order, ECF No. 55. The administrative record for Plaintiffs' NEPA failure-to-supplement claim was supplemented with a September 2016 update to the Forest Service's Resource Planning Act Assessment and a June 2016 resource detailing how to account for climate change when conducting a NEPA analysis. Id. The administrative record for Plaintiffs' ESA claim was supplemented with a December 2018 paper on the interim baseline adjustment for spotted owl critical habitat. Id.

The parties now move for summary judgment. Plaintiffs also move to supplement the administrative record and move to strike.

II. OPINION

A. Motion to Supplement Administrative Record

The APA "provides a right to judicial review of all 'final

11

agency action of which there is no other adequate remedy in a court.'" Bennett v. Spear, 520 U.S. 154, 175 (1997). Generally, "courts reviewing an agency decision are limited to the administrative record." Lands Council v. Powell, 395 F.3d 1019, 1029 (9th Cir. 2005) (citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985)). A "records review" case "typically focuses on the administrative record in existence at the time of the [agency's] decision and does not encompass any part of the record that is made initially in the reviewing court." Id. at 1029-30 (quoting Southwest Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996)).

The Forest Service and Fish and Wildlife lodged administrative records with the Court on December 9, 2019. See Notice of Lodging, ECF Nos. 34, 59. The Court entered a scheduling order on January 6, 2020, setting forth deadlines by which Plaintiffs were required to move to supplement or complete the administrative records. See Stip. of Joint Briefing Schedule and Order ¶ 1, ECF No. 37. The scheduling order also set a briefing schedule for cross-motions for summary judgement in the event a motion to supplement the administrative record was not filed. Id. ¶ 2. Plaintiffs filed a motion to supplement the administrative record on February 10, 2020, which vacated the summary judgment briefing schedule. See Mot. to Supp. Admin. Record, ECF No. 38. The Court decided that motion on May 28, 2020. See Order, ECF No. 55. Then, on June 12, 2020, the Court adopted the parties' proposed briefing schedule for cross-motions for summary judgment. See Stip. and Order,

ECF No. 58. That schedule did not provide for additional motions to supplement the administrative record. <u>Id.</u>

Plaintiffs now request that the administrative record be supplemented with two additional documents. <u>See</u> Mot. to Supp. Admin. Record at 2; Reply at 2, ECF No. 80 (withdrawing a third document from Plaintiffs' request). Plaintiffs filed this motion concurrent with their motion for summary judgment. Plaintiffs did not move to alter the scheduling order to permit a second motion to supplement the briefing schedule. Thus, Defendants filed their motions for summary judgment per the briefing schedule and while this request to supplement was still pending. As a result, Defendants did not consider these additional documents in preparing their motions for summary judgment. Moreover, Plaintiffs make no attempt to identify good cause for this delay or otherwise explain why the documents with which they now seek to supplement the administrative record were not included in their original motion to supplement. <u>See</u> Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."); <u>Hardy v. Cnty. of El Dorado</u>, No. 2:07-cv-0799-JAM-EFB, 2008 WL 3876329, at *1 (E.D. Cal. 2008) (noting "good cause" standard for modifying a scheduling order).

Simply put: Plaintiffs missed their window of opportunity for filing this motion and fail to present a reason for the Court to excuse this delay. Accordingly, Plaintiffs' motion to supplement the administrative record is DENIED.

B.  <u>Motion to Strike</u>

Plaintiffs move to strike a portion of the Forest Service

13

and Fish and Wildlife's memorandum in support of their cross-motion for summary judgment that they argue "advances a post hoc argument in support of the Forest Service's action" that is not found in the 2012 FEIS and "relies on scientific references not found in the administrative records."  Mot. to Strike at 2. Specifically, Plaintiffs request that the Court strike the portion of the memorandum that begins on line eleven of page eighteen and ends on line twenty-two of the same page.  Id. That portion of the memorandum argues that the Forest Service considered and rejected the position that thinning would result in greater fire intensity.  See Defs.' Mot. Summ. J. at 18.  In so arguing, Defendants reference two studies: Estes et al. 2012 and Weatherspoon 2006, and cite to FS-AR 00000061.  Id.

The parties agree that, "courts may not accept appellate counsel's post hoc rationalizations for agency action."  See Defs.' Opp'n Strike at 4, ECF No. 87 (quoting Or. Nat. Res. Desert Ass'n v. Bureau of Land Mgmt., 625 F.3d 1092, 1120 (9th Cir. 2010) (internal quotation marks and citation omitted)). And that "[i]t is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  Id.  Nonetheless, the Forest Service and Fish and Wildlife oppose the motion, arguing that their response regarding thinning and fire intensity is not a post hoc rationalization because it predates the Forest Service's approval of the Pettijohn Project by seven months and came from the agency itself.  Defs.' Opp'n Strike at 4.  Thus, it does not reflect a post-decisional litigation position developed by counsel.  Id.  The Court agrees.

The Forest Service approved the Pettijohn Project through a final ROD in March 2013. FS-AR 000307-30. Nine months prior, the Forest Service released an FEIS, which was subject to the Forest Service's pre-decisional administrative review process. FS-AR 000340-41; 36 C.F.R. § 218.5 (2012); see generally 36 C.F.R. pt. 218, subpt. A (2012). Plaintiffs submitted objections to the FEIS on July 3, 2012, as part of that process. FS-AR 000130-75. Plaintiffs objected to the Forest Service's claim that the increased risk of higher surface fire caused by the thinning is negligible when compared to the "desirable effects of reductions in ladder fuels and potential wildfire threats to older larger trees." FS-AR 000061. In response, the Forest Service explained that, in terms of fire risk, any reduction in canopy cover by the Pettijohn Project will be outweighed by the reduction in live and dead fuel loading and cited to Estes et al. 2012 and Weatherspoon 2006. Id. This response came seven months before the project was approved by the final ROD. See FS-AR 000326-27.

Forest Service and Fish and Wildlife quote to this response in the contested portion of their memorandum. See Defs.' Mot. Summ. J. at 18 (quoting FS-AR 000061). They were not wrong to do so. The Forest Service's response to Plaintiffs' objections during the administrative process did not assert a new rationale for the Pettijohn Project. The FEIS acknowledged the possibility that thinning might "result in faster mid-flame wind speeds and decreased fuel moistures, which can effect fire behavior." FS-AR 000878. The FEIS also noted that thinning from below retains the overstory canopy, which would "minimiz[e]

the potential changes to the fire environment post-treatment,"
while decreasing the potential for crown fires.  Id.  The
studies cited to by the Forest Service merely confirm that the
project's effect on surface fuel moisture will be negated by the
degree to which it reduces ladder fuels.  See FS-AR 000061 ("The
conclusion presented in the fire and fuel specialist report is
consistent with the findings of these studies.").

     Moreover, the Forest Service and Fish and Wildlife did not
rely on extra-record evidence in their memorandum.  The lines
Plaintiffs seek to strike are found in the Forest Service's
administrative record.  See Defs.' Mot. Summ. J. at 18 (quoting
FS-AR 000061).  Thus, the Court finds no issue with the Forest
Service and Fish and Wildlife relying on that portion of the
record to oppose Plaintiffs' hard-look NEPA claim.  See 5 U.S.C.
§ 706 (noting "the court shall review the whole record or those
parts of it cited by a party" in reviewing agency action under
the APA).  The fact that the studies themselves were omitted
from the administrative record is of no consequence.  See Defs.'
Opp'n Strike at 5.  The studies are sufficiently summarized in
the Forest Service's response to Plaintiffs' objection and they
were considered by the decision-maker before the project was
authorized.  See Keli McElroy Decl. ¶¶ 3-4, ECF No. 87-1.  This
suffices for them to be considered part of the administrative
record under the APA.  See Thompson v. U.S. Dep't of Labor, 885
F.2d 551, 555 (9th Cir. 1989) ("The whole administrative record,
therefore, consists of all documents and materials directly or
indirectly considered by agency decision-makers . . . .)
(emphasis in original) (internal quotation marks and citation

16

omitted)).

Thus, the Forest Service and Fish and Wildlife did not err in referring to their response to Plaintiffs' objections and citing the Estes and Weatherspoon studies. Accordingly, Plaintiffs' motion to strike is DENIED.

C. Cross-Motions for Summary Judgment

Plaintiffs move for summary judgment on their claims against the Forest Service and Fish and Wildlife. See Pls.' Mot. Summ. J. They argue that the Forest Service violated NEPA by failing to take a hard look at the effects of the project and failing to prepare a supplemental EIS; that the project is inconsistent with standards set forth in the NFMA and HFRA; and that Fish and Wildlife failed to use the best available scientific data available, erroneously determined no adverse modification of critical habitat would occur, and failed to reinitiate consultation, in violation of the ESA. Id. at 7–25. The Forest Service, Fish and Wildlife, and the Resource Council dispute this and argue that each of Plaintiffs' claims fail. See Defs.' Mot. Summ. J.; Def-Interv.'s Mot. Summ. J.

1. Standard of Review

Agency decisions that allegedly violate the ESA, the NFMA, NEPA, and HRFA are reviewed under the APA. See All. for the Wild Rockies, 907 F.3d at 1112. A court conducting APA judicial review does not resolve factual questions, but instead determines "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Sierra Club v. Mainella, 459 F.Supp.2d 76, 90 (D.D.C. 2006) (quoting Occidental Eng'g Co. v. INS, 753 F.2d

766, 769 (9th Cir. 1985)).  In a case involving review of a final agency action under the [APA] . . . the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record."  Id. at 89.  In this context, summary judgment becomes the "mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  Id. at 90.

The APA directs reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A)-(D).  Judicial review under the "arbitrary and capricious" standard is narrow and deferential.  Motor Vehicle Mfrs. Assn of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  A court may not "substitute its judgment for that of the agency."  Id.  "This deference is highest when reviewing an agency's technical analyses and judgments involving the evaluation of complex scientific data within the agency's technical expertise."  League Of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen, 615 F.3d 1122, 1130 (9th Cir. 2010) (citation omitted).

Agencies are required to "examine the relevant data and articulate a satisfactory explanation for its action."  Turtle Island, 878 F.3d at 732 (internal quotation marks and citation omitted).  An action is arbitrary and capricious where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of

18

the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or if the agency's decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id. at 732-33 (internal quotation marks and citation omitted).

### 2. Analysis

#### a. Abandoned Claim

As an initial matter, Plaintiffs have abandoned one of their ESA claims against Fish and Wildlife. See Pls.' Mot. for Summ. J. at 19, n.8. Plaintiffs withdraw Claim IV, which alleges Fish and Wildlife violated § 1536(b)(4) of the ESA by issuing an arbitrary and capricious incidental take statement. Id.; see also FAC ¶¶ 137-47. Plaintiffs have nine remaining claims. Each is analyzed below.

#### b. NEPA Claims

Plaintiffs' seventh and ninth claims assert that the Forest Service violated NEPA by failing to take a hard look at the Pettijohn Project's direct, indirect, and cumulative impacts and failing to prepare a supplemental analysis based upon significant new information or circumstances. See FAC ¶¶ 166-96, 203-16. Plaintiffs argue the Forest Service inadequately analyzed the project's alternatives and failed to consider the actual risk of catastrophic wildfire, the effects of fire and tree removal on spotted owl habitat, and the impact on greenhouse gas emissions. Pls.' Mot. for Summ. J. at 7-16. Plaintiffs also argue the Forest Service failed to consider new information in the environmental baseline and should have conducted supplemental analysis using that new information. Id.

at 16-17.

(i)  <u>Reasonable Alternatives</u>

While Plaintiffs' FAC alleges two NEPA claims and an HFRA old growth conditions claim, <u>see</u> FAC ¶¶ 166-196, 197-202, 203-216, Plaintiffs argue in their motion for summary judgment that the Forest Service also "failed to give full and meaningful consideration to all reasonable alternatives."  Pls.' Mot. for Summ. J. at 7-9.  The Forest Service and Fish and Wildlife counter that because Plaintiffs did not allege a reasonable range of alternatives NEPA claim in their FAC, they cannot pursue such a claim for the first time now.  Defs.' Mot. for Summ. J. at 10.  The Court agrees.

NEPA's regulations require an agency to "[rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14.  This obligation to consider alternatives under NEPA has been modified by HFRA, which directs the Forest Service to consider no more than three alternatives: (1) the proposed action; (2) no action; and, in certain cases, (3) an action alternative.  16 U.S.C. § 6514(c)(1)(C).  A reasonable alternatives claim is distinct from a hard-look claim under NEPA.  <u>See</u> <u>Te-Moak Tribe of Western Shoshone of Nev. v. U.S. Dep't of the Interior</u>, 608 F.3d 592, 599-602 (9th Cir. 2010) (analyzing hard-look and reasonable alternatives claims separately).

Reasonable alternatives are not mentioned in Plaintiffs' HFRA claim.  <u>See</u> FAC ¶¶ 197-202.  Nor are they mentioned in

20

Plaintiffs' NEPA claims. _See_ FAC ¶¶ 166-96, 203-16. However,

Plaintiffs do discuss the no-action alternative in one NEPA

claim. _See_ FAC ¶ 172. There, Plaintiffs argue the Forest

Service "failed to adequately analyze the no-action

alternative." _Id._ This allegation is different in kind from

one that alleges the Forest Service did not conduct sufficient

analysis of reasonable alternatives. Plaintiffs did not seek

leave to amend the FAC to add a reasonable alternatives claim,

and the Forest Service was not on notice that Plaintiffs

intended to bring this claim. Summary judgment "is not a

procedural change to flesh out inadequate pleadings." _Wasco_

_Products v. Southwall Technologies_, 435 F.3d 989, 993 (9th Cir.

2006). Thus, to the extent Plaintiffs seek to assert a

reasonable alternatives claim under NEPA or HFRA, that claim is

procedurally barred.

By contrast, the Court considers the no-action alternative

claim sufficiently pled. _See_ Fed. R. Civ. P. 8(a) (requiring a

short and plain statement of the claim showing the pleader is

entitled to relief). Nonetheless, the Forest Service considered

the no-action alternative in the FEIS. FS-AR 000380. And

adequately so. "Although brief, the [Forest Service's]

discussion [is] sufficient because the No Action Alternative

maintains the status quo . . . ." _Te-Moak_, 608 F.3d at 602

(finding defendant's one-paragraph consideration of the no-

action alternative sufficient). Moreover, Plaintiffs do not

contest the adequacy of the Forest Service's consideration of

the no-action alternative in their briefing. _See_ Pls.' Mot. for

Summ. J. at 7 ("In this case, the USFS considered only the

'proposed' and 'no-action' alternatives."); Opp'n to Fed. Defs.'
Mot. at 4-6.  Thus, the failure to adequately consider the no-
action alternative claim fails.

(ii) <u>Hard Look</u>

In assessing whether an agency took a hard look at a
proposed action, courts "employ a rule of reason standard to
determine whether the EIS contains a reasonably thorough
discussion of the significant aspects of the probable
environmental consequences."  <u>Allen</u>, 615 F.3d at 1130 (internal
quotation marks, citation, and alterations omitted).  Courts
"must uphold the agency decision as long as the agency has
considered the relevant factors and articulated a rational
connection between the facts found and the choice made."  <u>Id.</u>
(internal quotation marks and citation omitted).  Here, the
analyses in the FEIS and the supporting specialist reports on
the Pettijohn Project's effects on fire, fuels, and wildlife
amount to a sufficiently thorough discussion of the probable
environmental consequences.  <u>See</u> FS-AR 000401-44 (FEIS); FS-AR
002348-87, FS-AR 002341-47 (fire and fuels specialist report and
supplement); FS-AR 002705-820, FS-AR 002672-99 (BA and
supplement).

The Forest Service relied on scientific literature and
conducted two types of modeling to assess the project's
potential impact on fire behavior.  <u>See</u> FS-AR 000401-04
(modeling); FS-AR 000591-94 (modeling and scientific
literature); FS-AR 002381-84 (scientific literature).  One model
examined the potential effects at the scale of the entire
21,500-acre project area immediately following project

22

implementation, and the other considered effects at a treatment-level scale over time.  FS-AR 000401.  Both models concluded that the Pettijohn Project would reduce the risk of stand-replacing wildfires that burn at high intensity through the crowns of the trees.  See FS-AR 000411-15.

Plaintiffs argue that the Forest Service ignored relevant science and should have applied its expertise differently with respect to the model that examined the project's effect on fire behavior over the entire project area.  See Pls.' Mot. for Summ. J. at 9-13.  Plaintiffs question the Forest Service's decision to use 90th percentile fuel moisture, wind, and weather data, arguing that there is "conflicting scientific opinion about the severity of fires in the Klamath Mountains . . . ."  Id. at 10.  Plaintiffs also assert that the Forest Service ignored relevant science by not modeling higher surface fuel temperature under the proposed action.  See id. at 10-13.

However, regarding the severity of fires in the area, the FEIS expressly addressed the two studies cited by Plaintiffs (Miller, 2012; Odion et al., 2004).  See FS-AR 000406; FS-AR 000004-07 (the Forest Service's review of both studies).  The Forest Service considered each study, but ultimately decided to rely on its own "[s]ite-specific observations of fuels conditions [which] support the likelihood of risk of higher severity fires due to changes in species compositions and size- and age-class structures."  Id.  And 90th percentile conditions, which model late summer fires, were used "because this is the driest time of the year and the period when most catastrophic wildfires occur in the project vicinity."  FS-AR 000403.

As for the surface fuel temperatures used in the modeling, the Forest Service considered whether thinning would increase surface fuel temperatures and result in greater fire intensity. See FS-AR 0000061. Relying on recent studies, the Forest Service concluded that the surface fuel moisture differences between unthinned and thinned stands are minor and the negative effects on microclimate of thinning the stand are outweighed by the reduction in live and dead fuel loading. Id. (citing Estes et al., 2012; Weatherspoon, 2006). The FEIS explains, "thinning with proper fuels consideration can reduce fire-induced mortality to lower levels than would be expected without treatment." FS-AR 000407 (citing Graham et al., 1999; Raymond and Peterson, 2005).

The Court's review of the Forest Service's modeling and its consideration of scientific literature is subject to significant deference. See, e.g., Lands Council v. McNair, 629 F.3d 1070, 1074 (9th Cir. 2010) (holding courts apply their most deferential standard of review in "reviewing scientific judgments and technical analyses within the agency's expertise"). Under this deferential approach, courts do not "act as a panel of scientists, instructing the agency, choosing scientific studies, and ordering the agency to explain every possible scientific uncertainty." Id. (internal quotation marks and citation omitted). This is true even when conflicting opinions exist. EPIC v. U.S. Forest Serv., 451 F.3d 1005, 1017 (9th Cir. 2006) ("When specialists express conflicting views, we defer to the informed discretion of the agency."). Thus, the Forest Service's application of 90th percentile conditions in

its modeling and its determination that surface fuel moisture differences are minimal are both permissible.  These decisions were informed and reasonable.  See Allen, 615 F.3d at 1130.

It is similarly within the Forest Service's discretion to rely on studies it deems reliable.  See Weldon, 697 F.3d at 1043 (courts "defer to agency decisions so long as those conclusions are supported by studies that the agency deems reliable.").  In doing so here, the Forest Service did not act arbitrarily or capriciously.  See EPIC, 451 F.3d at 1016-17 (rejecting the argument that the Forest Service failed to address the scientific literature that directly disputes the allegations that commercial logging in mature stands will decrease fire danger).

Regarding the effect of fire on the spotted owl and its habitat, Plaintiffs argue that the Forest Service ignored scientific literature indicating that spotted owls continue to use recently burned forests and the model examining the potential effects on the entire project area forecasted only seven percent fewer burned acres of forest.  Pls.' Mot. for Summ. J. at 13.  However, the FEIS and BA examined the Pettijohn Project's potential effects on the spotted owl and its habitat. See FS-AR 000435-42; FS-AR 002736-50.  Notably, the Forest Service considered the study cited by Plaintiffs, explaining that, although the study showed spotted owls used recently burned habitat because it made prey more accessible by opening understory habitat, the study also showed that spotted owls "avoided high and moderate burn severity areas for roosting, and presumably for nesting."  FS-AR 000835 (citing Bond, 2009).

This satisfies NEPA's hard-look mandate.  See Conservation Cong.
v. U.S. Forest Serv., No. 2:12-cv-02800-TLN-CKD, 2014 WL
2092385, at *14 (E.D. Cal. May 19, 2014) (rejecting the argument
that the Forest Service insufficiently responded to studies
showing the benefits of wildfire to spotted owl habitat).
Moreover, rather than claiming that burned areas provide no
habitat for the spotted owls, the FEIS notes that the "loss of
overstory structure to high severity fire [] reduce[s] the
quality of nesting/roosting habitat.  This finding is consistent
with the Roberts, et al. (2011) study."  FS-AR 000835.

    As for Plaintiffs' assertion that the model demonstrates
the project will have an insignificant effect on the number of
acres burned, the model did not only project active crown fires
would decrease by seven percent across the entire project area.
See FS-AR 000411-12.  The model also demonstrates that the
project would decrease passive crown fires by eight percent,
while increasing surface-level fires by fifteen percent.  Id.
In addition, the modeling of treatment-level effects supports
the FEIS's conclusion that fire events in the thinned stands
would burn at much lower intensity and would largely preserve
enough canopy cover to retain spotted owl nesting and roosting
habitat.  FS-AR 000413-15.  Thus, evidence in the record
supports the FEIS's finding that the project would benefit
spotted owl habitat in the long-term by reducing the risk of
stand-replacing wildfires.

    Insofar as Plaintiffs contend the Forest Service's analysis
of greenhouse gas effects is flawed and inadequate, this
argument is procedurally precluded.  See Pls.' Mot. for Summ. J.

at 14–16.  Plaintiffs did not raise any issues related to greenhouse gas emissions during the administrative process. Thus, Plaintiffs failed to "structure their participation in the agency's decision[-]making process so as to alert the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration." Protect our Cmtys. Found. v. LaCounte, 939 F.3d 1029, 1036 (9th Cir. 2019). This failure to notify precludes Plaintiffs from challenging the FEIS's analysis of those emissions for the first time here. Id.; see also McNair, 629 F.3d at 1076.  Plaintiffs concede this point.  Pls.' Opp'n to Fed. Defs.' Mot. for Summ. J. & Reply ("Opp'n to Fed. Defs.' Mot.") at 6 n.7, ECF No. 78.

Plaintiffs go to great lengths to challenge different aspects of the Forest Service's analyses of wildfires and tree removal and their effects on spotted owl habitat and greenhouse gas emission, but in doing so, they miss the forest for the trees.  So long as the Forest Service considered the relevant factors and articulated a rational connection between the facts found and choices made, the Court must uphold the agency decision.  See Allen, 615 F.3d at 1130.  Here, the Forest Service met that requirement.  Its analysis is reasoned; it took a hard look at the probable environmental consequences of the Pettijohn Project.  As a result, the Court gives the Forest service the deference to which it is entitled.

(iii)   Supplemental Analysis

NEPA's implementing regulations require supplementation of an EIS when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on

the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). However, supplementation is not required "every time new information comes to light after an EIS is finalized." Marsh v. Or. Res. Council, 490 U.S. 360, 373 (1989). Requiring otherwise "would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." Id. Here, too, courts apply a "rule of reason" in assessing whether "the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered." Id. at 374 (internal quotation marks and citation omitted). "Whether new information requires supplemental analysis is a 'classic example of a factual dispute the resolution of which implicates substantial agency expertise.'" Tri-Valley CAREs v. U.S. Dep't of Energy, 671 F.3d 1113, 1130 (9th Cir. 2012) (quoting Marsh, 490 U.S. at 376).

Plaintiffs first argue that the Forest Service failed to consider new information in the environmental baseline. See Pls.' Mot. for Summ. J. at 16–17. In December 2018, Fish and Wildlife released an updated accounting of the spotted owl habitat loss from wildfires in the Shasta-Trinity National Forest. See FWS-AR SUPAR-001. This interim baseline adjustment reduced the estimated amount of nesting, roosting, and foraging habitat in the forest. FWS-AR SUPAR-008, Table 6. Plaintiffs argue this affects the FEIS's analysis of the direct and indirect effects of the project's fuel management activities on spotted owl habitat.

This argument lacks merit.  To assess the project's potential effects on spotted owl habitat, the FEIS examined a 25,274-acre spotted owl action area, reflecting a "1.3-mile buffer around all areas containing suitable nesting or roosting habitat that are proposed for treatment."  FS-AR 000419.  None of the area affected by wildfires considered in the interim baseline adjustment overlap with the 25,274-acre spotted owl action area.  Defs.' Mot. for Summ. J. at 24.  Plaintiffs do not dispute this.  Id.; see also Opp'n to Fed. Defs.' Mot. at 11-12. As a result, the information in the interim baseline adjustment had no effect on the FEIS's analysis of the project's potential effects on spotted owl habitat.  Thus, the Forest Service's decision to not supplement the FEIS in response to the interim baseline adjustment was neither arbitrary nor capricious.

Plaintiffs also argue that the Forest Service should have updated the project's greenhouse gas analysis in a supplemental EIS considering the agency's "updated guidance" for assessing greenhouse gas emissions.  See Pls.' Mot. for Summ. J. at 17. Yet, Plaintiffs do not explain how this guidance constitutes new information affecting the FEIS's assessment of greenhouse gas emissions in a way not previously considered.  Plaintiffs fail to identify new information sufficient to show that the Pettijohn Project will affect the environment in a significant way that is not already addressed by the FEIS.

In sum, the Forest Service has elucidated the possible impacts of the Pettijohn Project with a sufficient degree of detail.  It has adequately analyzed the no-action alternative, taken a hard look at the different impacts of the project, and

did not need to conduct the supplemental analyses Plaintiffs allege. The Pettijohn Project's FEIS is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. See 5 U.S.C. § 706(2). The Court GRANTS summary judgment in favor of the Forest Service, Fish and Wildlife, and the Resource Council and against Plaintiffs on Plaintiffs' seventh and ninth NEPA claims.

c.    NFMA Claims

The relevant land management plan in this case is the Shasta-Trinity National Forest Land and Resource Management Plan ("LRMP"). Plaintiffs' fifth, sixth, and tenth claims assert that the Forest Service violated the NFMA by failing to satisfy the standards set forth in the LRMP for snags, down logs, and old-growth retention, and for failing to ensure the Pettijohn Project is consistent with the 2011 Recovery Plan. See FAC ¶¶ 148-65, 217-21. Plaintiffs argue the Pettijohn Project will not maintain snags and down logs at naturally occurring levels and that the Forest Service has failed to establish the project's fire reduction efforts will focus on younger stands. Pls.' Mot. for Summ. J. at 17-18.

Regarding snags and down logs, the parties agree that the LMRP directs the Forest Service to maintain "dead/down material, hardwoods, and snags at naturally occurring levels." See Pls.' Mot. for Summ. J. at 18 (citing FS-AR 004866); Defs.' Mot. Summ. J. at 25. This standard applies across all LSRs in the Shasta-Trinity National Forest. See FS-AR 004773 (the LMRP "establishes Forest-wide standards and guidelines to fulfill the NFMA requirements"). Thus, it is not restricted to a project

30

area or the specific areas within the FMZs from which snags will be removed.  Under the Pettijohn Project, no snags will be removed as part of the thinning treatment.  Pls.' Mot. for Summ. J. at 18 (citing FS-AR 00984; FS-AR 001164).  Snags up to 24 inches in diameter within 150 feet of a road in a FMZ will be cut and left on the ground for safety purposes.  FS-AR 000792 (FMZ prescriptions).  Beyond that 150 feet, the size class of snags that may be cut is progressively smaller.  Id.

"'It is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of [the] NFMA' and for an agency action to comply with the NFMA, a reviewing court must be '[]able to determine from the [administrative] record that the agency is complying with the forest plan standard[s].'"  Conservation Cong. v. U.S. Forest Serv., No. 2:14-cv-02228-GEB-AC, 2015 WL 1295914, at *10 (E.D. Cal. March 23, 2015) (quoting Native Ecosystems Council v. U.S. Forest Serv., 418 F.3d 953, 961-62 (9th Cir. 2005)).  The thin-from-below treatments provide for no snags other than hazards to be cut, and only snags within certain distances of roads and meeting certain diameter thresholds to be cut in the FMZs. Neither prescription violates the LRMP.  See Conservation Cong. v. U.S. Forest Serv., 686 Fed.Appx. 392, 394 (9th Cir. 2017) (no violation of the LRMP snag standard where snags would only be removed if deemed a safety hazard); Conservation Cong., 2014 WL 2092385, at *12 (no violation of the LRMP snag standard where removal would occur in 150-foot FMZ corridor).

Plaintiffs' reliance on Or. Nat. Res. Council Fund v. Brong, 492 F.3d 1120 (9th Cir. 2007) is misplaced.  See Opp'n to

Fed. Defs.' Mot. at 14-15. There, the relevant forest plan
expressly limited the removal of large snags in LSRs. Id. at
1128. And the project in question allowed for the removal of a
significant number of large snags in LSRs. Id. That is not the
case here. Only hazards will be cut in the treatment areas and
only smaller snags will be removed from roadside areas and the
FMZs. See FS-AR 00984; FS-AR 001164; FS-AR 000792.

In addition, Brong's snag-retention analysis was "grossly
misleading" because the agency determined the amount of large
snag retention was sufficient by averaging salvaged and non-
salvaged areas together across all the acres included in the
logging. 492 F.3d at 1129-30. This finding is also inapposite
because, here, the Forest Service analyzed snag retention at the
project-level. An agency silviculturist used "forest stand-
level vegetation and fuels data collected during stand exams" to
quantitatively assess "changes in amount of snag and down log
assemblage habitat" from the project. FS-AR 002659. The data
was also used to qualitatively assess any "changes in density of
snags and/or down logs." Id. That analysis found that the
project's removal of snags would be insignificant in the thinned
stands and would not meaningfully affect snag density at the
landscape scale in the FMZs. FS-AR 002660. Thus, the Forest
Service did not arbitrarily conclude that the Pettijohn Project
complied with the NFMA's snag and down log standards.

The FEIS also notes that, "[a]lthough the FMZs would
experience a reduction in standing snags as a result of the
Pettijohn Project, Forest-wide aerial survey data indicates an
additional 591,000 acres of snag and down log habitat has been

32

created on the Forest since 1994 due to wildfire and insect and disease." FS-AR 00434. And modeling "indicates that ongoing tree mortality within adjacent untreated stands as well as within the thinned stands would provide relatively high snag densities throughout the project area." FS-AR 000804. Therefore, it was reasonable for the Forest Service to conclude that, while "overall snag density would be reduced," it would remain "well within Forest Plan guidelines." FS-AR 000436. This conclusion is "entitled to substantial deference." Weldon, 697 F.3d at 1056.

Regarding the NWFP's requirement that silvicultural fire-reduction activities focus on younger stands, see FS-AR 005989, there is no evidence in the record that the Pettijohn Project runs afoul of that requirement. The NWFP acknowledged the increased risk of fire in the Klamath Province and, as a result, allowed for fire-reduction efforts that include controlled logging. See FS-AR 005988-89; see also Allen, 615 F.3d at 1131 ("[T]he NWFP permits logging activities in LSRs . . . ."). Plaintiffs argue logging and thinning "will decrease moisture content and increase the likelihood of fire." Pls.' Mot. for Summ. J. at 18. However, as discussed in the NEPA section above, those claims were adequately considered and properly rejected by the Forest Service. The relevant analyses concluded the project will promote old-growth conditions and reduce the risk of stand-replacing wildfire. Thus, the Forest Service determined the project would comply with the NWFP and the Regional Ecosystem Office concurred. FS-AR 002069. "Far from conflicting with the protection of LSRs, carefully controlled

logging is a tool expressly authorized by the NWFP for long-term LSR maintenance." Allen, 615 F.3d at 1131. This determination "goes to the very heart of the Forest Service's expertise." Id. at 1134.

Accordingly, with respect to the project's effects on snags and down logs and its compliance with old-growth standards, the Court does not find that the Forest Service acted arbitrarily or capriciously in failing to comply with the NFMA. Its decision-making is neither erroneous nor inconsistent with the LRMP. See Forest Guardians, 329 F.3d at 1098. The Court GRANTS summary judgment in favor of the Forest Service, Fish and Wildlife, and the Resource Council and against Plaintiffs on Plaintiffs' fifth, sixth, and tenth NFMA claims.

### d. HFRA Claim

Plaintiffs' eighth claim asserts that the Forest Service violated HFRA by failing to ensure the Pettijohn Project maintains or restores old-growth forests. See FAC ¶¶ 197-202. Plaintiffs argue that approximately seventy-five percent of the areas to be treated are mature and old-growth stands and the project will treat "roughly 2,916 acres by 'thinning from below,' removing larger, fire-resilient trees, decreasing moisture in surface fuels, and increasing fire risk." Pls.' Mot. for Summ. J. at 19.

Plaintiffs' argument lacks merit. Of the thinning approved by the Pettijohn Project, approximately twenty-five percent will be in younger, mature stands and seventy-five percent will be in "mature and selected old-growth." FS-AR 002561. This does not violate HFRA. The silviculture specialist report explains that,

"[t]rees selected for removal will be suppressed trees and those specifically designated to release the growth of desirable species and tree sizes." Id. As a result, "[g]rowth is expected to accelerate on the residual stand component." Id. Thinning will also lead to "[i]ncreased stand vigor, reduced stand mortality, and reduced stand susceptibility to insect and disease." Id. Rather than harming old-growth stands, the thinning of younger trees will contribute to the development of old-growth characteristics and improve stand resiliency. Id.

Plaintiffs argue that, critical to the HFRA inquiry is whether the project will promote "fire resilient stands." Opp'n to Fed. Defs.' Mot. at 16 (citing 16 U.S.C. § 6512(f)(1)). As illustrated by portions of the record discussed above, the project meets that requirement. See FS-AR 000411-15. There is evidence that the project will reduce fire intensity and the risk of stand-replacing wildfires. Id. Plaintiffs also argue that "the only way to get the amount of timber to be produced from this project is to log large trees." Opp'n to Fed. Defs.' Mot. at 16. However, Plaintiffs cite to no evidence supporting this contention. By contrast, the Forest Service references portions of the record indicating the project will not remove old-growth trees. See FS-AR 000434; FS-AR 000420. And that 99 percent of the trees to be removed in the spotted owl nesting and roosting habitat are below 24 inches in diameter. FS-AR 000738, Figure A6-1.

The Forest Service's determination that the project complies with HFRA "is entitled to substantial deference." Native Ecosystems Council v. Marten, 807 F. App'x 658, 661 (9th

Cir. 2020).  Based upon the evidence in the record, the
Pettijohn Project is HFRA compliant.  The Court GRANTS summary
judgment in favor of the Forest Service and Fish and Wildlife,
and against Plaintiffs on Plaintiffs' eighth HFRA claim.

e.  ESA Claims

Plaintiffs' first and second claims assert that the Forest
Service and Fish and Wildlife violated § 7(a)(2) of the ESA by
failing to use the best available science and failing to avoid
jeopardizing, destroying, or adversely modifying spotted owl
critical habitat.  See FAC ¶¶ 103–25.  Plaintiffs' third claim
asserts that the Forest Service and Fish and Wildlife failed to
reinstate consultation in violation of 50 C.F.R. § 402.16(b), an
implementing regulation of the ESA.  See FAC ¶¶ 126–36.
Plaintiffs argue Fish and Wildlife failed to use the best
available science in two parts of its 2018 supplemental BiOp and
used outdated guidelines to determine the habitat values and
thresholds incorporated into its critical habitat effects
analysis and determination.  Pls.' Mot. for Summ. J. at 19–23.
As a result, the Pettijohn Project will destroy and adversely
modify spotted owl critical habitat.  Id. at 23–24.  Plaintiffs
also argue Fish and Wildlife should have reinitiated
consultation over effects on critical habitat given it had
access to updated data.  Id. at 25.

(i)  Best Available Science

In making a § 7 adverse modification determination, Fish
and Wildlife is required to use the "best available scientific
and commercial data available."  16 U.S.C. § 1536(a)(2); 50
C.F.R. § 402.14(g)(8); Locke, 776 F.3d at 995.  "Under this

standard, an agency must not disregard [] available scientific evidence that is in some way better than the evidence [it] relies on." Id. at 995. Plaintiffs contend that Fish and Wildlife's 2009 "Regulatory and Scientific Basis for U.S. Fish and Wildlife Service Guidance for Evaluation of Take for NSOs on Private Timberlands in California's Northern Interior Region" ("2009 Take Guidance"), see FWS-AR 016935-17012, is not the best available science for determining what habitat metrics would provide for population growth and recovery. See Pls.' Mot. for Summ. J. at 20–23. Rather, Plaintiffs argue Fish and Wildlife should have consulted and followed the habitat metrics outlined in the 2011 Recovery Plan, the 2012 Critical Habitat Rule, and the 2018 Forest Service Technical Report. Id.

This argument fails because Fish and Wildlife did, in effect, consider these habitat metrics. Fish and Wildlife used the 2009 Take Guidance as a starting point in its stand/treatment unit level analysis to obtain a field-verified baseline for the quality or condition of the spotted owl habitat proposed for treatment and the likely effects of the proposed treatment on the specific habitat in the treatment units. FWS-AR 004054-57; FWS-AR 001510-13. Notably, the 2009 Take Guidance is consistent with the recovery guidelines outlined in both the habitat retention recommendations of the 2011 Recovery Plan and the nesting and roosting metrics in the 2012 Critical Habitat Rule. Compare FWS-AR 017007, 017010 (the 2009 Take Guidance uses a recommended retention standard of 400 acres or 80 percent suitable nesting, roosting, and foraging habitat in a 500-acre area and 40 percent suitable habitat in a home range) with FS-AR

020357-60 (the 2011 Recovery Plan recommends prioritizing spotted owl sites that have at least 50 percent suitable habitat in the core and at least 40 percent suitable habitat in the home range); compare also FWS-AR 016948 (the 2009 Take Guidance describes high quality nesting and roosting conditions having at least 60 percent canopy cover) with 77 Fed. Reg. 71,876, 71,905 (Dec. 4, 2012) (the 2012 Critical Habitat Rule outlines that high quality nesting and roosting habitat contains 65-89 percent canopy cover).

As for the 2018 Forest Service Technical Report, that document post-dates Fish and Wildlife's April 2018 BiOp. See Ex. A to Mot. to Supp. Admin. Record, ECF No. 66-2. Thus, it was not considered in the agency's decision-making process and is not properly part of the record.

Plaintiffs also argue that Fish and Wildlife's failure to consider information in 2018 interim baseline adjustment resulted in a skewed baseline accounting of available critical habitat in the subunit and unit and invalidates Fish and Wildlife's adverse modification analysis. Pls.' Mot. for Summ. J. at 21-22. Here, too, this document post-dates Fish and Wildlife's April 2018 BiOp. See FWS-AR SUPAR-001 (dated December 20, 2018). Thus, it was not available for consideration. Fish and Wildlife's adverse modification analysis used a habitat baseline that incorporated all information up until the end of the 2017 fire season. FWS-AR 004063-65; FWS-AR 004166. The only information in the 2018 interim baseline adjustment not considered by the April 2018 BiOp was the change in critical habitat in the unit and subunit

caused by the 2018 fire season, which did not exist in April
2018.  Defs.' Mot. for Summ. J. at 32.

Fish and Wildlife could not have considered information
that did not exist, and fire events that had not occurred, when
it prepared its April 2018 BiOp.  And there is no § 7 violation
where the information was not available.  See Locke, 776 F.3d at
995 ("Under this standard, an agency must not disregard []
available scientific evidence . . . .") (emphasis added).
Moreover, as explained below, the information from the 2018 fire
season would have minimally impacted the April 2018 BiOp.

(ii)    Adverse Modification Determination

Plaintiffs challenge Fish and Wildlife's determination that
the Pettijohn Project would not result in adverse modification
of critical habitat.  Pls.' Mot. for Summ. J. at 22–25.  To
avoid adverse modification, the proposed treatments cannot
directly or indirectly alter the spotted owl's habitat in a way
that appreciably diminishes the conservation or recovery value
of the entire critical habitat designation.  Rock Creek Alliance
v. FWS, 663 F.3d 439, 442–43 (9th Cir. 2011); 50 C.F.R.
§ 402.02.  Thus, Fish and Wildlife analyzed the potential
effects the proposed project's treatments of 2,013 acres of
habitat might have on the spotted owl's overall 9,577,969 acres
of critical habitat.  See FWS-AR 004103-13; 16 U.S.C.
§ 1536(a)(2); 50 C.F.R. § 402.14(g).

First, Fish and Wildlife identified the relevant critical
habitat unit, subunit, and action area, and then calculated a
baseline inventory of spotted owl critical habitat (i.e.,
designated nesting, roosting, foraging, and dispersal habitat

types) within each area.  FWS-AR 004106; FS-AR 022825-26.  The Pettijohn Project is located within the Interior Coastal California Critical Habitat Unit ("Unit 11") and wholly within subunit ICC-7.  FWS-AR 004105.  Unit 11 encompasses 941,568 acres of critical habitat, subunit ICC-7 consists of 119,742 acres, and the project's action area contains 14,347 acres of designated critical habitat.  FWS-AR 004105-06.

Upon obtaining this baseline information, Fish and Wildlife analyzed the project's potential effects on several different scales and varying physical and biological features ("PBFs") of critical habitat.[3]  At the stand/treatment unit scale, which consists of the 2,013 acres selected for treatment, Fish and Wildlife reviewed field-verified spotted owl habitat metrics specific to the area.  See FWS-AR 016935-17012 (Fish and Wildlife "has conducted a thorough review and synthesis of published literature, unpublished data sets, and direct communication with [spotted owl] researchers in support of a rigorous process for evaluating the effects of habitat management on [spotted owls].").  It acknowledged that the proposed treatments would have adverse effects on certain stand/treatment units.  See FS-AR 022826-28.  However, Fish and Wildlife also determined that these adverse effects would primarily be short-term and were not likely to prevent spotted owls in these specific treatment units from nesting and foraging.  FWS-AR 001456-66; FWS-AR 004075-79; FWS-AR 004093-96.

---

[3] PBFs are used to characterize the key components of critical habitat that provide for the conservation of the listed species. FWS-AR 004104.

Using the information from the treatment unit analysis, Fish and Wildlife assessed whether the project's proposed treatments on the 2,013 acres compromised the capability of critical habitat within the project's action area to fulfill its intended recovery function. FWS-AR 004105-09. The action area consists of 14,347 acres of critical habitat that is meant to allow for long-term reproduction, connectivity to other habitat in subunit ICC-7, and recruitment of high-quality spotted owl habitat. Id. Here, too, the anticipated adverse effects from the project's treatments would primarily be short-term and only impact a relatively small portion of the nesting, roosting, and foraging habitat available in the action area. FWS-AR 004107-09. In addition, treatments would produce more fire-resistant and sustainable habitat, consistent with the spotted owl's 2011 Recovery Plan. FWS-AR 004112; FS-AR 022841-43.

Next, Fish and Wildlife looked to the project's impact on critical habitat within subunit ICC-7, which consists of 119,635 acres of critical habitat. FWS-AR 004109-10. The effects at the subunit ICC-7 scale were minimal as the proposed treatments affect only two percent of available nesting, roosting, and foraging habitat in that area. FWS-AR 004109. Fish and Wildlife determined that the project's treatments were, thus, unlikely to impair the ability of the critical habitat in subunit ICC-7 to contribute to its larger conservation and recovery purpose. Id.

Finally, at the broadest scale, the project's anticipated short-term adverse effects became nearly undetectable. FWS-AR 004109-10 ("The selected alternative, at that [] scale, is []

41

not reasonably likely to cause an adverse effect to the []

larger CHU 11.").  The project would temporarily adversely

impact only 0.28 percent of critical habitat available at the

Unit 11 level and "a fraction of a percent of the 12 million

acres of critical habitat rangewide."  FWS-AR 004112-13.

Ultimately, Fish and Wildlife determined that the project

would not compromise the subunit and unit's ability to

contribute to the range-wide critical habitat's overall

conservation and recovery purpose.  FWS-AR 004111-13; Rock Creek

Alliance, 663 F.3d at 442-43 (finding that Fish and Wildlife did

not err by conducting a large-scale analysis and by relying on

the relative size of the critical habitat to evaluate the

project's impact on the species).  Moreover, Fish and Wildlife

concluded that the project would help create more high-quality,

fire-resistant spotted owl habitat, consistent with the spotted

owl's 2011 Recovery Plan and the 2012 Critical Habitat Rule.

FWS-AR 004111-13.  Fish and Wildlife made these determinations

having conducted extensive analysis on all aspects of the

Pettijohn Project.  Thus, the adverse modification analysis, and

the conclusions drawn from it, are complete, reasonable, and

sufficiently supported by the record.  See FWS-AR 004103-13.

(iii)   Reinitiating Consultation

Lastly, Plaintiffs argue that the agencies must reinitiate

consultation based on new information in the 2018 interim

baseline adjustment.  See Pls.' Mot. for Summ. J. at 25.  "If

the data is new and the new data may affect the jeopardy or

critical habitat analysis, then [Fish and Wildlife] [is]

obligated to reinitiate consultation pursuant to 50 C.F.R.

§ 402.16."  Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1077 (9th Cir. 2004).  However, the additional data from the 2018 interim baseline adjustment does not affect Fish and Wildlife's critical habitat analysis.  See Defs.' Mot. for Summ. J. at 32-33.

The April 2018 BiOp analyzed the Pettijohn Project's effects on 1,546 acres of nesting, roosting, and foraging habitat designated as critical habitat.  See FWS-AR 004107-09.  That acreage represented 1.29 percent of the total critical habitat in subunit ICC-7 and 2.46 percent of the total nesting, roosting, and foraging habitat in ICC-7.  FWS-AR 004106, Table 21.  Using the additional data from the 2018 interim baseline adjustment in the analysis, the effect of treating 1,546 acres of nesting, roosting, and foraging habitat in ICC-7 represents 2.81 percent of the same habitat available in ICC-7.  FWS-AR SUPAR-008 (total nesting, roosting, and foraging in subunit goes down to 55,004 acres).  That is a difference of 0.35 percent from the April 2018 BiOp's evaluation.

With regard to the larger unit, the April 2018 BiOp assessed that the treated 1,546 acres of nesting, roosting, and foraging habitat would affect 0.28 percent of the total nesting, roosting, and foraging habitat in the unit.  FWS-AR 004106, Table 21.  Considering the 2018 interim baseline adjustment, the project affects 0.33 percent of the total nesting, roosting, and foraging habitat in the unit.  FWS-AR SUPAR-008 (total nesting, roosting, and foraging in larger unit goes down to ~~55,004~~ 462,186 acres).  A difference of 0.05 percent.  Thus, even with these revised numbers, the conclusions drawn from Fish and

Wildlife's analysis remains essentially the same: The Pettijohn's Project's treatments would not appreciably reduce the spotted owl's prospects for recovery and, therefore, would not likely result in adverse modification. See FWS-AR 004111-13. Accordingly, reinitiating consultation was not warranted.

In sum, the Court finds: (1) Fish and Wildlife used the best available science in conducting its critical habitat analysis; (2) the Pettijohn Project will not adversely modify spotted owl critical habitat; and (3) there was no need to reinitiate consultation. Fish and Wildlife's § 7 critical habitat analysis was consistent with the ESA, reasonable, and is supported by the administrative record. The Court, therefore, GRANTS summary judgment in favor of the Forest Service, Fish and Wildlife, and the Resource Council and against Plaintiffs on Plaintiffs' first, second, and third ESA claims.

III.   ORDER

For the reasons set forth above, the Court:

(1) DENIES Plaintiffs' Motion to Supplement the Administrative Record; (2) DENIES Plaintiffs' Motion to Strike; (3) DENIES Plaintiffs' Motion for Summary Judgment; (4) GRANTS the Forest Service and Fish and Wildlife's Motion for Summary Judgment; and (5) GRANTS the Resource Council's Motion for Summary Judgment.

IT IS SO ORDERED.

Dated: May 17, 2021

JOHN A. MENDEZ,
UNITED STATES DISTRICT JUDGE

44